Hutchins v. The State.

Filed Jan. 31, 1895.

---

No. 17,420.

## HUTCHINS v. THE STATE.

CRIMINAL LAW.—*Deputy Prosecutor.*—*Misconduct of.*—*Talking to Juror.* —It is misconduct for a deputy prosecuting attorney, while the jury are on their way to the jury room after being instructed in a criminal case, to speak to a juror who is afterwards appointed foreman, and volunteer to take a message to the latter's family.

SAME.—*Deliberations of Jury.*—*Misconduct of Foreman.* — *Requiring Observance of Parliamentary Rules.*—It is misconduct for the foreman of a jury, while a verdict in a criminal case is being deliberated upon, to refuse to allow any juror to express an opinion upon the case until he had first arisen and addressed the foreman and been recognized by him.

SAME.—*When Misconduct Cause for New Trial.*—Misconduct of the foregoing kind is cause for a new trial, where a conviction is had, unless it appears from the evidence, beyond any question, that the prisoner is guilty as charged.

SAME.—*Rape.*—*Corroborative Proof.*—*Evidence of Sexual Intercourse.*— *Non-Access by Others.*—The fact that an examination by a physician shows that sexual intercourse has been had with a married woman about the time of an alleged rape upon her, is not corroborative proof that a rape was perpetrated, in the absence of signs of violence and a showing of no access by others.

Hutchins v. The State.

SAME.—*Rape.*—*Insufficiency of Evidence.*—For evidence considered and held not sufficient to sustain a conviction for rape, see opinion.

From the Steuben Circuit Court.

*J. A. Woodhull* and *N. W. Gilbert*, for appellant.

*A. G. Smith*, Attorney-General, *J. Butler*, *H. L. Hutson*, *W. G. Croxton* and *F. M. Powers*, for State.

HOWARD, J.—The appellant was convicted in the circuit court of the crime of rape.

He assigns as error on this appeal, that the court overruled his motion for a new trial.

Among the reasons urged in favor of the motion was alleged misconduct on the part of the deputy prosecuting attorney and also on the part of one of the jury.

The first charge of misconduct was that the deputy prosecuting attorney, who assisted the State in the prosecution of said cause, after the jury had been charged and sent out by the court in the custody of a sworn bailiff to consult as to their verdict, held a private conversation with one of said jury, Peter B. Wicoff, its foreman, outside of the jury room.

The deputy prosecuting attorney, in a counter-affidavit, said in explanation: "That after the jury were instructed by the court and were on their way to the jury room, he did speak to Peter B. Wicoff, one of the jurors in said cause, and had the following conversation: 'I am going past your house this evening; do you want to send any word to your folks?' To which said juror replied: 'No, I guess not; yes, I do, too: If the folks are at home tell them to feed your horse and give you your supper and keep you over night.' That said conversation is the substance of all the conversation had between this affiant and said juror; * * * that affiant knew that said juryman had been absent from his home for several days and that he made the inquiry from said

Hutchins v. The State.

juryman as a pure matter of accommodation to said juror and his family and not otherwise, and that in so doing he thoughtlessly and unintentionally violated the instructions of the court, with no desire or intent to be contumacious and not with any intent or purpose to influence or prejudice the jury or any juror against said defendant or his defense."

If the prosecutor were called before the court to answer for contempt, we think this affidavit might be a sufficient excuse as to willful violation of the order of the court.

We fail, however, to see how it shows that appellant may not have suffered by the indiscretion of the representative of the State. It was undoubtedly intended, as the attorney admits, to do a kindness to the juror and his family. He does not, however, seem to understand that this defense but makes his fault the greater.

Kindness is ordinarily a virtue. But this was neither the time nor the place for manifestations of kindness and good will by the prosecuting attorney or his deputy, to one of the jurors who were about to decide the fate of a man whom the State had been during all the trial trying to send to State's prison. Kindness and sympathy for the juror and his absent family at that hour might well touch the heart of the juror with sentiments of gratitude towards the lawyer, who was also apparently an intimate friend, for the juror asked him to put up at his house for the night. Without intending any wrong, the mind of the juror might well be turned in the direction of his friend's known wishes; and if his judgment should be poised between the guilt and innocence of the prisoner, might not his heart turn the scale? Granting that no wrong was intended by either prosecutor or juror, yet the offense committed by both against a fair and impartial trial of the man accused of crime was most reprehensible.

Hutchins *v.* The State.

The alleged misconduct of the prosecutor becomes of greater moment when it appears that the juror in question was appointed foreman, and that he was consequently, in all probability, a man of influence in the jury room.

The other charge of misconduct is against the same juryman. After the jury had retired to consult upon their verdict, and after Peter B. Wicoff had been selected foreman, it appears by affidavit, based on information and belief, that he refused to allow any juryman to express an opinion, or say anything of the law or the evidence in the case, unless the juror so desiring to express his opinion should first arise and address the foreman as chairman, and not until the foreman should first recognize him; and it is claimed that the jury were thereby hindered from having a fair and free opportunity of discussing the merits of the case submitted to them.

This seems to have been an arbitrary mode of procedure. A jury, and each member thereof, should be absolutely free to express their opinions of the case. It occurs often, perhaps generally, that there are men upon the jury of the soundest judgment and good sense, who are yet unfamiliar with rules of debate, and unaccustomed to rise in their places and address the chairman of a meeting in a formal manner, and according to parliamentary rules. Such men might be more or less intimidated by such a rule in the jury room as is here objected to. We can not say that the prisoner may not have suffered by the enforcement of the rule.

Whether a judgment ought to be reversed for the foregoing causes might perhaps depend upon the case as presented in the record. If it appeared clear, beyond all question from the evidence, that the prisoner was guilty as charged, it may be that the misconduct referred to,

even the gross impropriety of the deputy prosecutor's action, ought not to be considered ground sufficient to set aside a verdict which was just and proper beyond any reasonable doubt.

If, however, it were at all a debatable question whether the prisoner were guilty, we think that a verdict against him should be at once set aside and a new trial granted.

The facts of this case, as we gather from the evidence, are as follows:

A Doctor Chappel and his wife lived alone on a farm near Angola, in Steuben county. On December 14, 1893, the doctor's health failing and his mind having become affected, he was, by his wife, through an arrangement with the county commissioners and the township trustee, placed in the county asylum or poor house, where he was visited frequently by his wife, and cared for more or less by her.

On the Wednesday preceding New Years she went to visit him, and staid until Friday afternoon. The first part of each night she staid with her husband, caring for him, and went to another room for rest during the latter part of the night. The trustee says the doctor was somewhat demented. The superintendent of the asylum says he was dressed part of the time, and would get up at times. He had a separate room to himself, though somewhat exposed, from the hall, to outside observation.

On Friday, which was the 29th of December, John Wentworth, a single man, who lived in a little house about forty rods from the Chappel house, went to Angola at request of Mrs. Chappel, using her team. He had known the doctor in the army, and was employed to get wood for Mrs. Chappel and care for her stock, and do such other work as she needed about the place. On this day he drove home from Angola by way of the asylum

to bring Mrs. Chappel home. On the way he overtook the appellant, who seems to have been a friend, or at least an acquaintance, of Mrs. Chappel. On the arrival at the asylum she greeted him, shaking hands and asking him to go in with her to see her husband. She then asked him to go home with them, where it appears he was going when overtaken by Wentworth.

Mrs. Chappel got supper for the two men and herself, after which she went to stay all night with a neighbor, Mrs. Sayles, while the appellant went and staid all night at Wentworth's house.

On Saturday morning Mrs. Chappel came back to her house, as also did appellant. She was then unwell, tired out from caring for her husband, and lay down, telling appellant there were papers for him to read. She grew more unwell, and he seemed to engage in the house work. Mrs. Sayles visited the house Saturday afternoon and found Mrs. Chappel quite sick. At Mrs. Chappel's request she prepared a bed for appellant up stairs.

Wentworth continued to do the chores and bring in wood morning and evening; and on Sunday morning when he went over Mrs. Chappel was still no better, and sent him for the doctor who came and prescribed for her, and pronounced her disease an attack of the grippe. The doctor gave the appellant directions for administering the medicine. Sunday afternoon Wentworth staid with Mrs. Chappel while appellant, by direction of Mrs. Chappel, went to a neighbor's after bread.

On Monday morning, when Wentworth went over, Mrs. Chappel asked him to go to town and get some things for her, oysters and lemons, and to bring some tobacco for appellant. As Wentworth went to town he passed the house of Mr. Metzger, and told of Mrs. Chappel's sickness. Mr. Metzger and his wife called over that afternoon. At Mrs. Chappel's request they returned in

the evening to stay all night, she saying to them that appellant had been sitting up for two nights, and would probably need some rest.    While Mr. and Mrs. Metzger were there Monday evening Mrs. Chappel wished to have her clothing removed, and she requested appellant to assist Mrs. Metzger in undressing her, which he did.

On Tuesday morning Wentworth found appellant, as before, attending to the household affairs.  Mrs. Chappel asked Wentworth to go to a neighbor, Mrs. Bowers, and ask her to come over, which he did.   He then, at her request, went again to town after the doctor. When Wentworth got back, some time before noon Tuesday, he found Mrs. Bowers and her baby, who had been there for some time.   The doctor, who had been there and gone before ten o'clock, says there was a baby in the house while he was there.   Mrs. Chappel asked Wentworth to help Mrs. Bowers home with her baby, which he did.   After coming back, he went to his own house to get his dinner, leaving appellant with Mrs. Chappel. When he returned, after dinner, Mrs. Sayles was with Mrs. Chappel.   All this time Mrs. Chappel had grown steadily worse.   The doctor testifies that on his second visit, Tuesday forenoon, he found her very much worse and excited, so that he could get no intelligible answer from her.   From the testimony of Wentworth and others, however, it appears that even after the doctor was there she was still able to give directions as to what she wanted done, and could be readily heard from the door of the room, five or six feet away.

From Mrs. Sayles, who was there, as we have seen, on Tuesday afternoon, comes the first testimony as to the charge of rape.   She says that on this afternoon, while appellant was present, Mrs. Chappel told her that on Sunday evening previous appellant had by force had sexual connection with her.   Mrs. Sayles says that on

this Tuesday afternoon she found Mrs. Chappel in bed; that she was feeling bad, and "she was pretty excited." Stating Mrs. Chappel's charge, Mrs. Sayles testimony continues: "She said he tried to get in bed with her, and she told him to keep out, because she didn't want him in there because it was so warm; and he did get in bed, and she pushed him out, and said 'I want you to get out,' and he got in on the back side of the bed; she told him 'I want you to get out of here, it is so warm,' and he done it. * * * She said she fought until she couldn't fight any more, then she had to let him do as he mind to; she said she couldn't do any more."

She then said to appellant who stood by: "I want you to clear yourself out; I don't want you here at all." Appellant answered: "I will go; well, I will go." While she was making the charge against him, appellant says to Mrs. Sayles: "She was out of her head; I do not mind what she said."

Mrs. Sayles being asked on cross-examination what appellant said to Mrs. Chappel's charge, answered: "Why, he said he didn't; he said he didn't try to get in bed with her; she says, 'Chet you did;' and he says, 'I did no such a thing;' and she says, 'Chet there's no use of you lying, you know you did,' and he didn't say any more."

Appellant then left the house as he was ordered. Mrs. Chappel died the next day, in the evening.

One witness only was called by appellant, Jennie Crasher, a neighboring girl, fourteen years old. She called to see Mrs. Chappel on Monday morning, which was New Years. She says that appellant was sweeping the floor and washing the dishes while she was there. Mrs. Chappel told her, speaking of appellant, that "he was an awful good fellow; she says she wouldn't known what she would have done if he had not been there to

take care of her; she said he used to take care of his mother when she was sick.''

This was the morning after the crime is charged to have been committed, the morning, too, when Mrs. Chappel asked Wentworth to bring tobacco from town for appellant. On that day, too, in the evening, Mrs. Chappel asked Mr. and Mrs. Metzger to sit up with her, as appellant needed rest after sitting up two nights. And before going up stairs to bed that evening, at Mrs. Chappel's request, appellant assisted Mrs. Metzger in removing Mrs. Chappel's clothing. She said nothing, as appears, to Mrs. Metzger or her husband that night when alone with them of any wrong done to her; nor did she to Mrs. Bowers, the next forenoon, when she came to take care of her. Neither did she speak to the doctor nor to Wentworth. Nor until Tuesday afternoon, after the doctor had found that he could not get any intelligible answer from her, and when Mrs. Sayles found her feeling pretty bad, and excited, do we find that she at any time treated appellant otherwise than with the utmost trust and confidence; suffering and requesting him to do offices for her which might be expected rather of a kind hearted woman than of a man.

With this evidence it is utterly impossible to believe that the crime of rape could have been committed on this woman by this man on the Sunday evening previous.

But there was a post mortem examination made of the body of Mrs. Chappel. The testimony of the physician was substantially that she died of lung disease, in connection with heart trouble. By certain of the physicians, however, the belief was expressed that death was hastened by nervous shock, and some disposition is shown to refer this to the alleged outrage.

It is argued besides that the fact that the physicians

found that sexual intercourse had, within a short time previous, been had by some one with the deceased woman is corroborative proof that rape was perpetrated as charged. Before this could be allowed it should appear both that there was no probability that any other man might have had intercourse with her and also that there were some indications that such intercourse had been by force. As to the latter all the physicians testify that there was no mark of any violence or injury whatever on any part of the body, nothing to indicate that the intercourse had been by force. As to the fact that another person might have had connection with her, we have to remember that she was a married woman and that she had spent part of the preceding Wednesday and Thursday nights with her husband. While it may seem improbable that, on [account of his ill health and demented condition, the husband should have sought the embraces of his wife on these occasions, yet it is not at all impossible. The opportunity was ample, and such lawful embraces should be presumed rather than that doubt should be cast against a person accused of crime. Crime is not to be presumed, but must be proved.

The crime as charged upon the sick woman would be so great an outrage on humanity that we prefer to believe that this woman, who was so kindly treated by this man all through her sickness, and who trusted and spoke so well of him for two days after the time of the alleged offense, and while she was yet in her right mind, was in fact, as appellant said, "out of her mind" when she made this unsupported charge against him, a charge which he denied at the time. It seems far more probable that she was on Tuesday afternoon, as she had been somewhat in the forenoon, suffering the mental aberrations often resulting from the mysterious disease from which she was probably suffering at the time and had

been ever since her return from the county house, and of which she died the next day.

The life or liberty of a citizen should not be taken on mere conjecture. The law is that either shall be taken only in case the right to do so is established beyond all reasonable doubt.

The judgment is reversed, with instructions to grant a new trial, and the clerk is directed to issue the proper order to the sheriff of Steuben county to return the appellant from the State prison, where he is confined, to the jail of said county.

