(No. 22518.—

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* MITCHELL KAZMIERCZYK, Plaintiff in Error.

*Opinion filed October 22, 1934.*

JULIUS REZNIK, for plaintiff in error.

OTTO KERNER, Attorney General, THOMAS J. COURTNEY, State's Attorney, and J. J. NEIGER, (EDWARD E. WILSON, J. ALBERT WOLL, and HENRY E. SEYFARTH, of counsel,) for the People.

Mr. JUSTICE ORR delivered the opinion of the court:

The sole question in this case is whether the evidence is sufficient to sustain the conviction of Mitchell Kazmierczyk, a nineteen-year-old youth, on the charge of raping Geraldine Schreiber, a fourteen-year-old girl. Mitchell, who waived a jury trial, was found guilty in the criminal court of Cook county and given the minimum sentence of one year in the penitentiary. He brings the case here for review by writ of error.

Geraldine and her companion, Elaine Sorenson, had been keeping company in a very informal manner with two boys, Clarence Troy and Fred Rapala. It was a friendship which began and was fostered by meetings on the street and generally followed by automobiles rides. On Sunday, June 11, 1933, the two boys met the girls about 2:00 o'clock in the afternoon at a pre-determined street corner in Chicago. Fred was driving his father's car. This the girls entered and were taken to the apartment home of Mitchell and his parents. The boys knew that Mitchell's parents were away. Mitchell had not invited them to his home and had no information that they were coming there. Fred left the party long enough to go to his home and secure a half-pint of whisky. Upon his return cocktails were mixed by Clarence in the kitchen and everyone except Elaine drank them. Geraldine, described by Clarence as "his girl," showed her affection for him in various ways that afternoon by following him into the kitchen, sitting on his lap and hugging and kissing him in the presence of the other witnesses. There is no evidence that she catered to her amorous disposition by any such affection toward either Mitchell or Fred. She testified that she had known Clarence for about three months and had been out with him on two previous occasions but had never met Mitchell until June 11. She said that after they arrived at Mitchell's home they all sat in the living-room for about forty-five minutes and that she then went to the kitchen with Clarence and drank one of the highballs he had mixed. She testified that she had only been in the kitchen with Clarence about ten minutes when Mitchell came in, took her by the arm and led her across the hall into a bed-room. There she said he lifted up her dress and had sexual intercourse with her against her will but without any outcry on her part. No further details were related by her, except that he threatened to strike her if she refused. Her testimony in many respects was not

357—38

corroborated by any other evidence and part of it is incredible and at distinct variance with the stories told by the other four. For example, all the evidence indicates that the four visitors stayed at Mitchell's home from about 2:30 until nearly 6:00 o'clock that afternoon, yet Geraldine's story of being there forty-five minutes before going to the kitchen with Clarence, of staying there only ten minutes before Mitchell took her to the bed-room, where she remained five minutes, and of going home fifteen minutes later, accounts for only one hour and fifteen minutes of the three hours and a half that she remained in the apartment.

Elaine was the only other witness who testified for the People, and her testimony was decidedly contradictory and failed to corroborate Geraldine's story in many essential particulars. She first testified that she did not see Geraldine go into the bed-room with Mitchell, repeated this statement the second time, and then enlarged upon it in an answer to a third question by the State's attorney. However, after hearing part of her testimony in the boys' court read to her she back-tracked, and said that her statement made in the boys' court that Mitchell went into the bed-room with Geraldine was correct and that they remained there about a half hour. Later, on cross-examination, she resumed her first position by saying that she did not see either Clarence or Mitchell go in the bed-room and was not sitting where she could see whether they went there or not. She later partially contradicted this last statement by saying that she had seen Clarence and Geraldine go into the bed-room together, and that Mitchell had said in her presence that he was going in there and call them into the front room. These statements are at such variance that we cannot believe any of her testimony. She also contradicted Geraldine's testimony relating to the time the latter first complained of Mitchell's conduct. Geraldine had said that while she and Elaine were going home to-

gether that afternoon she told Elaine that Mitchell "got fresh" with her. Elaine, however, could not recall such a statement, and in answer to another question concerning Mitchell's conduct that afternoon she said that she asked Geraldine "if Mitchell had done anything to her," and Geraldine replied, "No." Elaine was later recalled by the court to testify as to the condition of Geraldine's dress, and testified that when Mitchell and Geraldine had come out of the bed-room Geraldine's dress was turned wrong-side out, but on cross-examination she qualified this by saying she did not know whether the dress was turned wrong-side out when Geraldine came out of the bed-room with Clarence. This story was denied by Geraldine, who said that she did not have her dress off and that it was not at any time worn by her with its wrong side out. The record is silent as to any complaint made by Geraldine to her mother, and, while the latter testified, she confined herself solely to her daughter's age.

Mitchell denied that he had intercourse with Geraldine but related that with her consent they walked into the bed-room together, where they remained for about five minutes. During this time he said they told some jokes, and he asked her, in the idiom of the day, if she ever indulged in sexual intercourse. When she said "no" he said "O. K." and they walked out of the bed-room and again joined the others in the living-room. He further testified that Clarence went in the bed-room with Geraldine and that they remained there about an hour together while he and Fred entertained Elaine in the living-room; that he then knocked on the bed-room door; that Fred was also standing in the hall where he could see the door; that at first there was no answer, and that when he opened the door Geraldine was standing in the room in her underclothes and Clarence was also partly undressed. After telling Geraldine and Clarence to "snap out of it and scram," Mitchell said he walked back to the living-room and shortly

the two came out. He said the four visitors left his home about a half hour later.

The trial judge was apparently bewildered by this conflicting testimony and took an adjournment for four days until the other two boys, Clarence and Fred, could be brought in to testify. Their testimony, as we view the case, only adds to the confusion, and if it has any effect it strengthens and corroborates much of Mitchell's story. Fred testified that it took him about twenty minutes to get the liquor, and that when he returned to Mitchell's home the latter was in the living-room while Clarence and Geraldine were in the kitchen. He said he stayed with Elaine in the living-room most of the afternoon; that Mitchell was playing the piano for a while, and that Clarence and Geraldine were together in the kitchen about twenty or twenty-five minutes. He said that he did not see Mitchell go into the bed-room at any time but did see Clarence and Geraldine at the entrance of the bed-room, where they were kissing and hugging each other. He could not say whether they had been in the bed-room or not.

Clarence, who testified as a court's witness, said that he and Fred had taken the two girls out riding on three previous occasions before June 11, each time picking them up on the street in the same neighborhood. He said that Geraldine was with him in the kitchen only about two minutes, when they came back into the dining-room and living-room. He further testified that after Geraldine had sat on his lap for awhile she went into the bed-room and he went into the adjacent wash-room; that she found a dress hanging on the dresser which belonged to Mitchell's sister and also admired certain pictures in the bed-room; that he did not go in the bed-room but stood in the door of the hall, where he could see its contents; that the door of the bed-room could not be closed because it would strike against the bed, and that while he and Geraldine were standing there Mitchell approached and said they should

go home. He denied ever saying in the boys' court, or elsewhere, that he had seen Mitchell and Geraldine in the bed-room but replied that he had seen them in the hall together.

We have reviewed the record carefully and are unable to reconcile the conflicting testimony. Geraldine testified to no details of the attack upon her except as above related, and parts of her story are discredited by other testimony. That she was attempting to conceal her loose conduct from her mother, who sat in the court room, is of no consequence. She made no outcry, and there is no testimony that she was not composed when she and Mitchell appeared again in the living-room. Her testimony that she made a complaint to Elaine is flatly denied by the latter, and the record fails to show that she made any complaint to her mother when she reached home or that her clothes were found in torn or soiled condition. There is nothing in the record to show any penetration or laceration of her private parts, nor does the record show that she was examined at any time by a doctor. The attempt at corroboration of her testimony by Elaine is valueless, as it contains a variety of contradictions. On the other hand, Mitchell is shown not to have known the girls or to have made any dates with either of them at any time. He did not invite them to his home or know that they were coming. He did not furnish the whisky or help mix the drinks to his uninvited guests, and his denial of improper relations with Geraldine is in part corroborated by the testimony of both Fred and Clarence. Under the circumstances his story must be given as much credence as that of the prosecutrix.

Courts are especially charged with the duty to carefully examine the evidence in rape cases, where, as has been justly observed by Lord Hale, an accusation is easily made, difficult to be proved, and still more difficult to be defended by one ever so innocent. (3 Greenleaf on Evi-

dence, sec. 212; *Shirwin* v. *People*, 69 Ill. 55; *People* v. *Freeman*, 244 id. 590.) We have given due consideration to the fact that the trial judge saw and heard the witnesses and was in much better position than we are to judge the truth or falsity of their statements. And we are not unmindful that in exceptional cases, where no other evidence is available and where the fact that rape has been committed is established by clear and convincing proof, we have held that the testimony of the prosecutrix, uncorroborated by other witnesses, may be sufficient to justify a conviction. (*People* v. *Sciales*, 353 Ill. 169; *People* v. *Andreanos*, 323 id. 34.) But this is not such a case, as much of the testimony of the prosecutrix is discredited and lacks corroboration by other witnesses present and in position to know and speak the truth. This court has repeatedly held that where a conviction of rape depends upon the testimony of the prosecuting witness and the defendant denies the charge, the evidence of the prosecuting witness should be corroborated by some other evidence, fact or circumstance in the case. (*People* v. *Bolik*, 241 Ill. 394; *People* v. *Blanch*, 309 id. 426; *People* v. *Blockburger*, 354 id. 301; *People* v. *Glasser*, 335 id. 263; *People* v. *Abbate*, 349 id. 147.) It is our duty to carefully review the evidence in a criminal case, and if it is not sufficient to remove all reasonable doubt of the defendant's guilt and to create an abiding conviction that he is guilty the conviction will be reversed. (*People* v. *Serrielle*, 354 Ill. 182; *People* v. *Nemes*, 347 id. 268; *People* v. *Fitzgibbons*, 343 id. 69.) In our judgment the evidence in this record is not sufficient to justify the conviction.

The judgment of the criminal court of Cook county is therefore reversed and the cause is remanded.

*Reversed and remanded.*