562

The People of the State of Illinois, Defendant in Error, *vs.* Bert Nelson, Plaintiff in Error.

*Opinion filed June 14, 1935.*

J. J. Ludens, for plaintiff in error.

Otto Kerner, Attorney General, L. L. Winn, State's Attorney, and J. J. Neiger, for the People.

Per Curiam: Bert Nelson was convicted by a jury in the circuit court of Whiteside county on a charge of statutory rape of Mary Mohrman on January 25, 1934, she then being twelve years of age. His punishment was fixed at one year and six months in the penitentiary. Judgment was rendered on the verdict, and the cause is here on a writ of error.

The grounds urged for reversal are that the trial court erred in the admission of certain testimony, and that the evidence is not sufficient to sustain the verdict.

At the time of the alleged offense defendant was a retired farmer fifty-eight years old and lived with his wife in the city of Morrison. The Mohrman family had lived next door to them about two years. Defendant owned a farm northeast of the city, to which he drove back and

forth in his automobile. The school which Mary Mohrman attended is in the north part of town, on the road to defendant's farm. She rode with him on several occasions going home from school and at other times when he saw her on the street. Difficulties arose between the two families, principally relating to the Mohrman children, and resulted in an ill-feeling. Mary Mohrman testified that prior to any act of intercourse with defendant she took rides with him after school. On one occasion during the latter part of May, 1933, they drove to Crocker's bridge, just outside the south city limits of Morrison. On three other afternoons they drove to Scharfenberg's lane, a public street in the northeast part of town, leading to residences and connecting two other streets. He made small gifts of money to her and she permitted him to put his arm around her and kiss her. On the last trip they got into the back seat of the car and he asked her to have intercourse with him and offered her a dollar, but she refused. Some time later he gave her a dollar, which she spent. She also testified that about August 25, 1933, they drove out to Holt's woods, about one mile north of town, and that defendant reminded her of the dollar and said he was entitled to intercourse. She consented, and the act took place in mid-afternoon on a road in the woods, at a point about twenty feet from a main traveled country road. She could see the public road from the car and the car could be seen from where the road led in. He gave her fifty cents. About ten days afterward he told her she should not tell about it, because if anybody found it out they would both go to the penitentiary. The next act occurred at the same place about September 12, at the same hour in the afternoon. The third time was on the public highway near a cemetery about three and one-half miles northeast of Morrison, in the middle of the afternoon, about October 20. He gave her one dollar, and then, observing that her shoes were worn, gave her five dollars more to buy

a new pair, which she purchased some days later. On January 25, 1934, at about 2:30 in the afternoon, they drove south from Morrison to the Fenton road and within 400 yards of Route 3 had intercourse. While they were so engaged a car turned onto the highway from Route 3, traveling twenty-five miles an hour. They finished the act, cleansed themselves with cloths and got into the front seat before the car reached them. If her testimony is true, these things were all accomplished in less than thirty seconds after she saw the approaching car. Before driving back onto Route 3 he put on his coat and she put on her undergarment. He gave her an apple and eight dollars for the purchase of a dress. About the latter part of February he asked her to go out again with him. She said she did not want to go, and he told her if she did not he would talk to her mother. That statement does not comport with her story that he told her they would both go to the penitentiary if anybody found out about their relations, nor is it otherwise plausible. She further testified that defendant told her to wear the new shoes so as to get them worn some but not to let her parents see them. She wore them back and forth to school, changing on the way, carrying the new ones home and the old ones to school. On November 1 or 2 defendant told her on the road home from school to give him the shoes the next night and he would mail them to her. The next day, as she was going home from school with Lois Hawk, defendant called her to his car. She arranged to meet Lois later at the Whiteside Hotel, got into the car and gave him the shoes. He gave her $16 with which to purchase a new coat. After a while she met Lois as agreed. On the next morning she received the shoes by mail in a box, marked "People's exhibit 1." The address was on a piece of paper two inches wide and three or four inches long, in the upper right-hand corner. The box shown her was without any such address label. In accounting for its absence she testified that she

wanted to find out what was under it. She then said that she did not take it off and she did not think it was taken off in her presence. Finally she said it was burned up. The box has been certified to this court. It is a corrugated carton for mailing a single pair of shoes. In the upper right-hand corner there is a printed shipping label of the Musbeck Shoe Company, Danville, Illinois, addressed with a typewriter to Ralph Bolhous, Morrison, Illinois, a cobbler and shoe dealer, from whom it is claimed defendant procured the box. Part of the label is torn, but neither the label nor the box shows any evidence of another label having been attached. The box bears evidence of having been mailed twice, once at Morrison on November 3, 1933. In the upper left-hand corner Mary Mohrman's name and address, in care of her father, is written with a lead pencil, but there is no testimony that tends to show defendant wrote it and it is not claimed that he did.

Lois Hawk testified that she was with Mary Mohrman when she got into defendant's car and later met her at the Whiteside Hotel but made no mention of seeing her have any shoes or package. Why the shoes were not given to defendant at the time of the conversation on the day previous, and how her mother failed to see them when she brought them home from school each day, are not made to appear.

On direct examination, Ralph Bolhous, a shoe dealer, testified that he received People's exhibit 1 by mail from the shoe company and it was the only shipping box he received in 1933, and that he gave it to defendant some time in the late fall. On cross-examination another box of the same kind was shown the witness and marked "Defendant's exhibit 1." This box has also been certified to this court. It has a similar shipping label and is like the other box, except that one end is missing and a portion of the sides is bent inward to take its place. It also bears some significant grease or oil stains. Bolhous testified that he

received it from the Musbeck Shoe Company and that the two boxes were originally of the same kind. He gave defendant only one box, and admitted that he did not know whether the box he gave defendant was the one offered by the People or the one produced by defendant. Defendant testified that he did not get People's exhibit 1 from Bolhous and it had never been in his possession. He obtained defendant's exhibit 1 from Bolhous in the latter part of December in which to send his speedometer away, and it is the only box he got from him. He did not send the speedometer because he decided to get a new car, and the box had been in his garage at home ever since. The grease or oil stains tend to corroborate his testimony. The box would accommodate a speedometer after the sides were bent to close the end.

Over defendant's objection Lois Hawk was permitted to testify that when Mary Mohrman met her at the Whiteside Hotel after riding with defendant they went to a store, where Mary purchased a coat for $10 and left it there for a while. It nowhere appears in the testimony of the complaining witness that the money she paid for the coat was obtained from defendant. She testified that on November 6 or 7, four or five days after the coat was purchased, she and defendant drove out past Richardson's, about a mile northeast of town. He had her write an anonymous note, to the effect that someone was sending her the coat, but if she could not use it to pass it on, and told her to put it in the coat box so her mother would not suspect anything. He had driven off the side of the road in the slippery grass and was unable to get back. She and Richardson helped push the car back onto the road. Richardson testified that it was in October, and not in November, when he assisted them with the car.

How any ordinary parent could be deceived by schemes so obviously transparent is beyond conjecture. If Mary Mohrman's story is true, the receipt of the shoes by mail

would immediately start an inquiry by her parents, and the slightest investigation would have disclosed their source. Her handwriting on the note in the cloak box, instead of allaying any suspicion of her mother, would naturally excite it. Parents with any degree of interest in the welfare of a daughter do not blind themselves to the source of unexplained gifts of wearing apparel.

Defendant testified that Mary Mohrman often rode with him from down-town to her home or to the school house. He was never outside the city limits with her except the drive to Crocker's bridge, shortly after the Mohrman family moved next door, and when they drove to Richardson's. On the latter occasion, while riding home from up-town, she said she would like to drive. He said he would teach her, and with his assistance they drove out by Richardson's. In turning around he got stalled. She and Richardson pushed the car back onto the road. They were not gone over ten or fifteen minutes. He was never with her at any of the places where she testified they were intimate. He never put his arm around her or kissed her. He denied ever having intercourse with her at any time or place, giving her any money or shoes or mailing any shoes to her. He denied seriatim every charge she made against him. He was under the care of Dr. Maurits, of Morrison, from October, 1933, to January, 1934. He was in the Morrison Hospital from November 8 until December 6 on account of a gall bladder operation. He was confined to his bed part of the time in December and January. The supervisor, an ex-sheriff, and an auctioneer, each of whom knew defendant for many years, testified to his good reputation for chastity and morality.

Notwithstanding the fact that Bolhous could not identify People's exhibit 1 as the box he gave defendant, it was admitted in evidence under circumstances tending to show that defendant's exhibit 1 was the box, and the only box, received by defendant. This was highly prejudicial, and

it is impossible to tell how far it influenced the jury in arriving at a verdict of guilty.

The conviction of defendant depended upon the uncorroborated testimony of Mary Mohrman. We have repeatedly held that where a conviction in a rape case depends upon the testimony of the prosecuting witness and the defendant denies the charge, the evidence of the prosecuting witness should be corroborated by some other evidence, fact or circumstance in the case. (*People* v. *Kazmierczyk,* 357 Ill. 592; *People* v. *Blockburger,* 354 id. 301; *People* v. *Abbate,* 349 id. 147.) According to her story, each act of intercourse took place in broad daylight, at a place where it could easily be observed. Two of them were on the public highway, and in one instance on a paved road in close proximity to a through route. Her story of the manner in which the first three acts were performed does not carry conviction of truth, but, on the contrary, appears highly improbable. She admitted that a part of her testimony on preliminary examination was untrue. For a period covering the last two alleged acts, defendant, a man fifty-eight years old, was in ill-health, and for a part of the time in a hospital on account of a major operation. There was an ill-feeling of long standing between the two families.

While proof of good character is no proof of innocence, it may be sufficient to raise a reasonable doubt where other evidence is not of a satisfying character. (*People* v. *Dameron,* 346 Ill. 408.) In this case defendant not only has the benefit of his good reputation, but the testimony of the prosecutrix of itself raises a strong probability of his innocence. No good purpose could be served by a retrial.

The judgment of the trial court is reversed.

*Judgment reversed.*