BURTON *v.* STATE OF INDIANA.

[No. 28,828. Filed May 5, 1953.]

John G. McNutt and Bernard Korbly, of Indianapolis, for appellant.

J. Emmett McManamon, Attorney General, John Ready O'Connor and William T. McClain, Deputy Attorneys General, for appellee.

EMMERT, C. J.—This is an appeal from a judgment on a finding made by the court, without the intervention of a jury, that appellant was guilty of sodomy on his daughter under the first clause of §10-4221, Burns' 1942 Replacement, and that appellant should be imprisoned in the State Prison for a term of not less than two nor more than fourteen years and be fined in the sum of $100.00.[1] The indictment was returned by the grand

---

1. "Whoever commits the abominable and detestable crime against nature with mankind or beast; . . . shall be deemed guilty of sodomy, . . ." Section 10-4221 Burns' 1942 Replacement.

jury of Marion County on April 5, 1950, and charged the offense was committed "on or about the 25th day of March, A. D. 1950." The error assigned here is that the court erred in overruling appellant's motion for a new trial.

It is not necessary to set forth in detail the testimony concerning the alleged depraved acts of appellant. We adhere to the policy announced in *Sanders* v. *State* (1940), 216 Ind. 663, 666, 25 N. E. 2d 995, as follows:

> "This was a prosecution of the 'abominable and detestable crime against nature.' The statute gives no other definition of the crime, obviously out of regard to the better sentiments of decent humanity, and to leave the record undefiled by details. The court has read the evidence in the record, and for the same reasons which influenced the framers of the statute, refuses to defile the reports by a recital of the sordid, immoral, depraved, and detestable statements therein contained."

The grave nature of the offense charged as well as the nature of the testimony has caused this court great concern, for we realize the danger to an accused when he is charged with a sexual offense committed only in the presence of a prosecutrix. See 3 Wigmore, Evidence (3rd Ed.) §924a. Although on review we do not attempt to place ourselves in the position of the trial judge in determining the credibility of the witnesses or the weight of the evidence, yet it is our duty to carefully scrutinize the evidence to determine if the trier of the facts had sufficient evidence to find an accused proved guilty beyond a reasonable doubt. We believe the Supreme Court of Illinois has correctly determined the duty of a court of last resort in such cases, as it was stated in *People* v. *Scott* (1950), 407 Ill. 301, 304, 95 N. E. 2d 315, 316:

"Lord Hale once aptly observed that an accusation of rape is easily made, hard to be proved and still harder to be defended by one ever so innocent. (*People* v. *Freeman,* 244 Ill. 590; 3 Greenleaf on Evidence, sec. 212; I Hale's Pleas of the Crown, 634.) It is for this reason that reviewing courts are especially charged with the duty to carefully examine the evidence in rape cases. (*People* v. *Kazmierczyk,* 357 Ill. 592.) It is the further duty of a reviewing court, where a verdict is returned by a jury in a criminal case or where a similar finding is made by a court where a jury has been waived, not only to carefully consider the evidence but to reverse the judgment if the evidence is not sufficient to remove all reasonable doubt of the defendant's guilt and is not sufficient to create an abiding conviction that he is guilty of the crime charged. (*People* v. *Abbate,* 349 Ill. 147.)"

Our court in *Hutchins* v. *State* (1894), 140 Ind. 78, 39 N. E. 243, and *Eyler* v. *State* (1880), 71 Ind. 49, reversed convictions for rape, after a careful examination of all the evidence, because from the evidence in behalf of the state, it was impossible to find the appellants had been proven guilty beyond a reasonable doubt. In the appeal at bar we have carefully examined all the evidence to make certain, as much as any human agency can, that we do right and justice to appellant as well as the state. As was stated by the majority opinion in *Watts* v. *Indiana* (1949), 338 U. S. 49, 52, 69 S. Ct. 1347, 93 L. Ed. 1801, 1805, "and there comes a point where this Court should not be ignorant as judges of what we know as men."

The prosecutrix was ten years old at the time she testified, and without her testimony the charge was not proved under any view of the evidence. This record is wholly silent that the state took any steps whatever to determine the prosecutrix was not a fantast, or was not under the compelling domina-

tion of her mother.[2] Since the record is silent on this safeguard, we must presume the state did not heed the warning contained in Dean Wigmore's treatise on Evidence (3rd Ed.) Vol. 3, §924a. He advised that *"No judge should ever let a sex-offense charge go to the jury unless the female complainant's social history and mental makeup have been examined and testified to by a qualified physician."*

"It is time that the Courts awakened to the sinister possibilities of injustice that lurk in believing such a witness without careful psychiatric scrutiny."

At the conclusion of this section Dean Wigmore, after quoting the writing of numerous psychiatrists, quoted from the report of the American Bar Association's Committee on the Improvement of the Law of Evidence, as follows:

" *'Psychiatric Examination of Witnesses in Sex Cases.* The penalties for sex-crimes are very severe, —justly so, in most cases. But the very severity of the penalty calls for special procedural precautions to protect an innocent accused from condemnation by unreliable testimony.

" 'Modern psychiatry has already made its bow and been introduced properly to the criminal courts, by way of examining the mental condition of the accused. But there is also a necessity for invoking its aid for a certain type of witness in a certain class of criminal charges.

" 'Today it is *unanimously* held (and we say "unanimously" advisedly) by experienced psychiatrists that the complainant woman in a sex offense should *always* be examined by competent experts to ascertain whether she suffers from some mental or moral delusion or tendency, frequently found espe-

2. "Pseudologia phantasticia is a mixture of lies with imagination. Not infrequently, this the basis of alleged sexual assault. Girls assert they have been raped, sometimes recounting as true a story they have heard, falsely naming individuals or describing them." 1 Gray's Attorneys' Textbook of Medicine (3rd Ed.), §96.16, p. 940.

cially in young girls, causing distortion of the imagination in sex cases.

" 'The imperative nature of this measure is further emphasized by the legal fact that the penalty for intercourse with a girl under sixteen years (so-called "statutory rape") is extremely heavy—sometimes twenty years; in one State, life imprisonment! Thus the erotic imagination of an abnormal child of attractive appearances may send an innocent man to the penitentiary for life. The warnings of the psychiatric profession, supported as they are by thousands of observed cases, should be heeded by our profession.

" 'We recommend that in all charges of sex offenses, the complaining witness be required to be examined before trial by competent psychiatrists for the purpose of ascertaining her probable credibility, the report to be presented in evidence.' " Vol. 3, p. 466.

The evidence given by the prosecutrix discloses she had had considerable coaching. She said she had talked it over with her mother who cautioned her to be sure to tell the truth. She was very indefinite as to the various places she had lived with her parents, and the prosecuting attorney had great difficulty in getting her to make any statement at all placing the venue of the prosecution in Marion County. She told a weird story about her father abusing her in the daytime while he was driving a truck to Cincinnati, Ohio, and another time when she went with her father in the truck to a cleaning establishment in South Bend. She disliked her father for buying Christmas presents for her because he bought them on credit, and she said it was wrong to buy presents on credit. She stated her father "kidnapped" her mother after he had been arrested for the offense herein charged, and after the mother had filed an action for divorce. There is no credible evidence in this record of any kidnapping, and this idea could only have been implanted by the mother.

She testified most of the acts and abuses had occurred while she was sleeping in a bedroom separate from her parents, but that she slept both before and after such abusive conduct, although she struggled and fought and he hit her on the legs, and she cried hard to herself. She never made any complaint to her mother except the time immediately before the father was arrested, and this was not made until one morning when her mother was cooking lunch. Her excuse for remaining silent was her father threatened physical violence to her and her mother. Her mother told appellant several times before the separation that "he was going to pay for what he did." This happened whenever they were quarreling.[3] The mother had a medical book in the household the children examined, and she said her father from the book had explained having babies and he was going to make her have one when she got older. The prosecuting attorney was permitted to ask the prosecutrix all sorts of leading questions which were not limited to the details of the abnormal acts charged. The mother was divorced in June of the same year the indictment was returned, and on December 23rd of the same year she remarried. She said she had hated her father ever since she was four years old because he beat her mother and was mean to the children.

The mother testified as to the various places they had lived, and her husband's various assaults and batteries upon her. She said that for two years she had found towels under suspicious circumstances near the bed of the prosecutrix, but never once did she ask the prosecutrix how they hap-

---

3. The following is part of her cross-examination:
Q. "But you did hear her a number of times say that she was going to see that he was put away?"
A. "No, she just said that about once or twice."
A. "You mean after he left? She said he would pay."

pened to be there, or if the father had been abusing her. She told a bizarre story about finding mirrors in her bedroom at night so that her husband, from the prosecutrix's bedroom, could see when she got out of bed. There was no explanation offered as to how he was going to see her from any light about the house. Her incredible story about her husband kidnapping her to take her on a picnic in a station wagon and then raping her is most consistent with an intention to get a divorce so she could be free to remarry. She did not deny hitting her husband in their various family fights.

The appellant testified as a witness in his own behalf. On cross-examination he admitted convictions for assaults and batteries, but there was nothing in his past record to indicate that he was morally depraved or a pervert. Some of his relatives who had lived in the household testified in substance they had observed nothing unusual about his conduct with the prosecutrix. Appellant at all times had maintained his innocence. He had been questioned at length by the police officers and had given them a written statement denying his guilt when he was "hysterical" under the questioning. This was not introduced in evidence.

In the examination of the record we find attached thereto as required by §9-1903, Burns' 1942 Replacement, affidavits of Anna May Shelburn, Wanda May McKinney and Shirley Ann McKinney which in substance state that the prosecutrix at the Rhodius Park swimming pool the latter part of July, 1950, stated that she lied on her father and she would do it any time she wanted to. Two of the affidavits stated in substance that the prosecutrix stated that the man who had the new car would be her new daddy. The record does not show any evidence was introduced at a hearing on the motion for new trial, and the state did

not file any counter-affidavits. Under this state of the record, as a matter of pleading it must be assumed that these statements were made by the prosecutrix.

With such a record before us we fail to find any evidence that would convince us beyond a reasonable doubt of the appellant's guilt. Many times this court has laid down the test for reasonable doubt by requiring that the facts must have such a convincing force that the jurors would be willing to act upon them in matters of the highest importance, affecting their dearest interests, under circumstances where there would be no compulsion to act at all. Guilt is not established by mere opportunity to commit crime, nor can a conviction be sustained on speculation or conjecture. If the trier of the facts in this case had properly applied the test for determining proof beyond a reasonable doubt, he could not properly have found the appellant guilty as charged. For these reasons we believe the finding of the trial court was not sustained by sufficient evidence.

By this decision we do not hold that in every case where a sexual offense is charged there should be a psychiatric examination of the prosecutrix. There are many cases where the facts and circumstances leave no doubt of the guilt of the accused, but the record here does not present such a case.

The judgment is reversed, with instructions to the trial court to grant appellant's motion for a new trial.

Draper, J., dissents with opinion in which Bobbitt, J., concurs.

## DISSENTING OPINION

DRAPER, J.—I dissent, and to make my reason clear, it will be necessary to state somewhat more of the evidence, as taken from the record, than is set out in the majority opinion.

It is true the little girl was indefinite as to the places she had lived with her parents. The fact is that the appellant and his family lived a nomadic life for years, rarely living in one place more than a few days or weeks. She testified that these acts with which the appellant was charged, which included the act technically known as fellatio and the act technically known as cunnilingus, as well as other acts which I will not describe, were performed at various places and in various cities and sometimes in the appellant's truck,[1] and had gone on for a long period of time. Considering the restless roving of this family, it does not seem strange to me that the child was somewhat indefinite about the various places in which they had lived.

In March 1950 the child complained for the first time to her mother. She first told her mother about another little girl,[2] and then told about herself. The mother immediately called a cab and went with her three children to police headquarters, and there told the police about the complaint her daughter had made to her. They went from there to the grandmother's and that night the little girl was taken to the Guardian's Home. She remained at the Home three or four weeks. While there the policewoman took her to the Juvenile Court where her statement was taken.

At the police station the day after the appellant was indicted the little girl, her mother, her brother, a policeman and two policewomen were present and Sylvia told about the appellant's conduct toward her in the appellant's presence. The appellant denied the accusations

1. The child's testimony with reference to the appellant's conduct toward her on the trip to Cincinnati was that it occurred in the night time.

2. This other girl's mother is a sister of appellant. She was one of appellant's witnesses. She refused to let her daughter make a statement and refused to cooperate with law enforcement officers in an investigation of the "affair" between the appellant and her daughter.

and called the little girl a liar. He also made accusations against his wife and suggested she take a lie detector test. She said she would if he would, but he refused to do so.

The written statement signed by appellant referred to as having been made when he was "hysterical" under questioning was made more than three months after the appellant was indicted. The appellant sent for Officer Bevan, and the officer went to General Hospital where appellant was then confined and took down the appellant's statement. It was wholly voluntary and made on the appellant's own initiative. It contained no denial of the charge pending against the appellant, unless inferentially, but consisted almost entirely of unprintable accusations against his wife. It was not introduced in evidence.

The little girl, who was past ten years of age at the time of trial, and in grade 5A in school, freely admitted she had talked with her mother and with the prosecutor and deputy prosecutor. At no time did anyone tell her what she would be asked, and no one told her what to say. Her mother told her to tell the truth. She did testify she hated her father, and said it was because he did those bad things to her and hit her mother. While some leading questions were asked, I think they were justified in the light of the child's age and the nature of the testimony. Her testimony in the main was not given in answer to leading questions. Skillful and penetrating cross-examination failed to impair it.

The mother did testify that on a number of occasions she had observed appellant and the little girl together under circumstances that caused her concern. I will not detail them here, but merely state that they involved, among other things, his presence at or in her bed at unusual times and the placing of his hands on her body.

The mother tried to find out what was going on. Questions put to the appellant concerning his conduct produced threats and beatings. At one time he tore all her clothes off and made the children stand there and watch, and he got his gun and threatened her. On another he twisted her leg and knocked her "completely cold," and would not let the little girl call the police. On one occasion she left for several days and took the child with her. She took no other action because she did not know positively whether anything was going on, and thought there could be nothing wrong.

The appellant was convicted of assault and battery several times in connection with these and other beatings. He was once convicted of child neglect. All but one of appellant's convictions for assault and battery grew out of complaints lodged by his wife, and she at one time had him put under peace bond. She did not meet her present husband until after she was divorced from the appellant.

I omit the revolting details of how appellant accomplished his purpose on numerous occasions and of the threats he made and the precautions he took to escape detection.[3] The child's testimony is in part corroborated by the testimony of her brother who is two years older and was in grade 7A at the time of trial. He displayed no animosity toward the appellant. The mother's testimony concerning how the appellant kidnapped and raped her after she filed suit to divorce him does not appear to be unbelievable in the light of the other evidence. In any event that circumstance might affect the credibility of the mother, but it could hardly affect that of the child.

---

3. In connection with the mother's testimony concerning mirrors placed by the appellant, she testified that the door to the bedroom was open and a light on in the living room.

Although the foregoing recital is wholly incomplete, I have set it out from the record because I believe that when it is considered along with the evidence set out in the majority opinion, it shows beyond peradventure that the case presented involved only questions of fact to be resolved by the trial court. From the very beginning this court has adhered to the doctrine that we will not weigh conflicting evidence, and that we will not judge the credibility of witnesses who appear and testify. If it were otherwise, our system simply would not hold together. To adopt a different plan now must inevitably result in a series of weird miscarriages of justice. The reasons have often been stated. In his effort to ascertain the truth the trial judge has a conspicuous advantage. The printed or typewritten record fails to reveal to this court what the trial judge so plainly sees. It is difficult enough to evaluate human testimony without trying to do so from a reading of the testimony. Such does not reveal the appearance of the witness, his composure or lack of it, his changing facial expressions, the ready response, the halting answer, the appealing glance at counsel, and the many other indicia of truth or falseness that mean so much to the experienced lawyer or judge.

It is not for us to decide where the truth lies. Testimony concerning the outrages that were perpetrated upon the child in this case naturally strains the credulity of normal men. We are loath to believe that human nature can be so altogether debased. Yet we know as informed men and as judges that such things do happen, and it is the duty of courts to protect those against whom such sins are committed, especially when they are children of tender years. I do not believe we have any right to label testimony in a case of this kind, which has been credited by the trial judge, as being "bizarre"

or "incredible," unless we are ready to say that truth is no longer stranger than fiction, or we are willing to set up our own notions of what the evidence shows as final and unimpeachable truth.

Under the law of this state a child ten years of age is a competent witness. Burns' 1946 Repl., §2-1714. In this case it was also developed that the child had gone to church and Sunday-school in the past; knew the difference between the truth and a lie; and knew what it meant to swear in court to tell the truth. It is true there was no evidence that the child was not a "fantast." Neither was there any evidence that the appellant was incapable of testifying falsely. But no objection was made to the testimony of this child because she had not been cleared by a psychiatrist. None such could be made. Our legislature has not seen fit to require such as a condition precedent to the right to testify in court, and I do not believe this court has any right to impose it.

I do not hold lightly the language found in Wigmore's Treatise on Evidence (3rd Ed.), Vol. 3, §924a, which is referred to in the majority opinion. I think it merits the careful consideration of the General Assembly. But if the suggestions therein made are to become the law in Indiana, it should be made law by the legislature. Procedural methods and safeguards should be established and clearly pointed out. To say that a woman may not testify against a man in a sex case unless she first submits to a psychiatric examination covering, perhaps, a period of many months, in the absence of legislation requiring it, seems to me to be an unwarranted arrogation of authority which this court does not have. To say that in some cases she must do so, and in other cases she need not, seems to me to introduce an intolerable element of uncertainty into the administration of justice in this state, for no one can know in advance whether this

court will be of the opinion that such should have been done.

Under what circumstances, when, by whom and on whose motion psychiatrists should be appointed is left wholly to conjecture. Under what conditions they shall conduct their inquiries, to whom or how they shall make known their opinions, or with whom they shall file their reports, if any, is an open question. How such opinions or reports can be used in a prosecution against an accused or otherwise find their way into the record is a mystery to me. I do not know whether the state undertook to determine whether this little girl was a "fantast." If so, I doubt whether the state would have had the right to prove it. I do know that the appellant did not see fit to inquire into that possibility on cross-examination.

The affidavits of the other girls referred to in the majority opinion are not a part of the record in this case because they were not brought in by bill of exceptions. They are, therefore, not before us. This rule has been established by an unbroken line of cases, and was last announced by us in a unanimous opinion which was filed less than two months ago. See *State ex rel.* v. *Graham* (1953), 231 Ind. 682, 110 N. E. 2d 855. The statements are, moreover, indefinite, and obviously not drawn in the language of those who signed them. They were not relied upon by the appellant in this appeal.

The appellant was furnished with able and experienced counsel, and he was vigorously and ably defended. He elected to waive trial by jury and submit his case to a trial judge who has had many years of experience as such. Disputed questions of fact were presented and disputed questions of fact were resolved. On the testimony of the child, as corroborated by her older brother and by her mother, the trial court found the appellant

guilty. In my opinion the evidence amply sustains the finding and the judgment should be affirmed.

Bobbitt, J.—Concurs.

NOTE.—Reported in 111 N. E. 2d 892.