BREEDLOVE v. STATE OF INDIANA.

[No. 29,217. Filed May 17, 1956.]

*Robert D. Ellison* and *Emerson J. Brunner,* of Shelby-ville, for appellant.

*Edwin K. Steers,* Attorney General, *Owen S. Boling,*

*Richard M. Givan,* and *Robert S. Baker,* Deputy Attorneys General, for appellee.

BOBBITT, C. J.—Appellant was indicted for murder in the first degree, tried by jury, found guilty as charged and sentenced to the Indiana State Prison for life.

The sole error here assigned is the overruling of the motion for a new trial.

We shall consider only those alleged errors discussed and urged in the argument section of appellant's brief. In the order presented they are:

*First:* Appellant asserts that the trial court erred (a) in overruling his oral motion to withdraw his plea of not guilty for the purpose of filing a plea in abatement; and (b) in refusing him permission to file a plea in abatement.

A plea in abatement cannot be filed after a plea of not guilty has been entered, unless the plea of not guilty is first withdrawn. The withdrawal of a plea of not guilty for the purpose of filing a plea in abatement is within the discretion of the trial court. *Stevens* v. *State* (1952), 230 Ind. 518, 520, 105 N. E. 2d 332; *Cooper* v. *State* (1889), 120 Ind. 377, 380, 22 N. E. 320.

Hence, when appellant's motion to withdraw his plea of not guilty was overruled, the trial court properly refused permission to file his plea in abatement. The question then which determines the entire issue pertaining to appellant's attempt to file a plea in abatement is —Did the court abuse its discretion in overruling his motion to withdraw the plea of not guilty?

The rule pertaining to permission to withdraw a plea of not guilty and interpose a plea in abatement, which governs this court in our consideration of the question here on appeal is ably stated in *Mack* v. *State* (1932), 203 Ind. 355, 365, 180 N. E. 279, 83 A. L. R. 1349, as follows:

". . . but the granting of the motion is within the sound discretion of the court, and the inquiry on appeal must be as to whether the court by its action abused that discretion. It is proper, in that connection, to take into account the question of the delay already had at the time the motion was filed, the question of cause shown, and the question as to whether or not the substantial rights of the appellant were prejudiced by the court's ruling."

The record discloses that the motion to withdraw was not filed for a period of 17 months from the date on which the not guilty plea was entered. Appellant attempts to excuse this delay by stating in his brief that, "While an attorney appointed by the court to represent a pauper, owes his client certain duties, Appellant feels that such duties do not anticipate that such attorney should risk the chance of contracting tuberculosis in coming in personal contact with his client, while the client is so afflicted."

We do not consider this a sufficient reason for such delay, especially when appellant's attorneys contacted him personally on more than one occasion during the 17 month period, including his appearance in court in company with them on a hearing on petition to be admitted to bail.

In the case at bar, as was true in *Mack* v. *State, supra,* there is nothing in the record to show what facts were presented to the trial court in support of the motion to withdraw the plea of not guilty and here, as this court there held, the presumption of law "is in favor of the court's ruling." On the record before us it will be presumed that appellant failed to show sufficient cause for the withdrawal of his plea of not guilty.

There is no showing that appellant's substantial rights were in any way prejudiced by the trial court's ruling. The record sustains this conclusion because the motion to withdraw failed to show sufficient ground

therefor. *Mack* v. *State, supra* (1932), 203 Ind. 355, 365, 180 N. E. 279, 83 A. L. R. 1349.

For the reasons above stated we find no abuse of discretion by the trial court. *Badgley* v. *State; Brown* v. *State* (1949), 226 Ind. 665, 672, 82 N. E. 2d 841; *Cooper* v. *State, supra* (1889), 120 Ind. 377, 380, 22 N. E. 320; *Farlow* v. *State* (1925), 196 Ind. 295, 301, 142 N. E. 849.

*Second:* Appellant further asserts that one fingerprint found at the scene of the crime was not his and this is proof of his nonexclusive opportunity to commit the crime, hence, under the rule as stated in *Christen* v. *State* (1950), 228 Ind. 30, 40, 89 N. E. 2d 445, and *Myers* v. *State* (1954), 233 Ind. 66, 116 N. E. 2d 839, this fact is not sufficient to support a conviction. We agree with appellant that opportunity to commit a crime is not enough to support a conviction. However, the state in the case at bar does not rely upon opportunity alone. The opportunity as established by the presence of appellant's fingerprints at the place and time of the crime is supported by other evidence of probative value sufficient to support a finding of guilty. This was not the situation in the Christen and Myers cases, and they are not applicable under the factual situation in this case.

*Third:* We next consider whether the verdict of the jury is sustained by sufficient evidence. A review of the evidence most favorable to appellee discloses the following:

At about 2:30 A.M. on the morning of September 11, 1946, a nurse and her aid, working on the second floor of the Rotary Convalescent Home at the Indiana University Medical Center on Michigan Street in the City of Indianapolis, Indiana, heard screaming and other noises coming from the first

floor. The nurse went downstairs to see what was going on, and found the deceased, Alberta Green, lying in the hallway beside the treatment room on the first floor. She then called the night watchman and when he came they went over to the deceased and, after examining her, the nurse then went and stood at the door while the night watchman went outside to look around the grounds. While standing at the door she heard a noise behind her and, upon looking around, saw a man dragging the deceased through a doorway into the dining room. She screamed for the policeman and by the time he had returned the man had disappeared.

This witness testified, in part, as follows:

"Q  Now, you tell the Jury as much [as] you can about the appearance of this man you saw dragging Miss Green.

"A  Well, I saw him framed in the doorway and I would judge he was about medium build. The thing that I remember most was a brown felt hat, what you call a snap brim, I believe, with a handkerchief tied around his face. That's the way I remember him.

"Q  Can you remember anything about his clothing, as to whether it was light or dark?

"A  It was evidently dark.

"Q  Do you know whether or not he was a colored man?

"A  Yes, definitely.

"Q  Could you tell us anything about his features at all?

"A  The profile, as I saw, was fairly smooth from the nose down, or from the forehead down to the nose. That's all I saw.

"Q  You have seen the defendant in this case before?

"A  Yes, sir.

"Q State whether or not the defendant resembled the man that you saw.

"A He does.

"Q And after this night, where did you first see the defendant?

"A On July the 5th, 1952.

"Q And where was that?

"A In Indianapolis.

"Q And precisely where?

"A In the line-up.

"Q Just tell what you saw there that time.

"A There were six men, six colored men in the line-up and we were to pick out which we thought would be the one most likely to fit in with the picture we had in mind.

"Q What did you do?

"A Picked out this defendant.

"Q Now, in the line-up and prior thereto, was his name given to you at all?

"A No, sir.

"Q By no one?

"A No, sir.

"Q In the line-up, did men respond to different names?

"A Oh, yes. I knew his name was Breedlove, but he didn't give his name in the line-up as being Breedlove.

"Q He gave some other name?

"A Yes, sir.

"Q Do you recall what the other name was?

"A It was Billy, like Billy the Kid, Billy Kahn, or something like that.

. . .

"Q Now, I believe, I forgot to ask you what you observed of Miss Green's physical condition when you saw her on the floor.

"A  She was unconscious.

"Q  Any bruises or blood or cuts or bumps or anything?

"A  Oh, yes. She was quite badly beaten. There was a bump on her head, on the forehead and on the back of her head.

"Q  Did you touch her skull to see whether it had been broken or dented?

"A  No, I didn't check that. It was bruised, her forehead was quite bruised.

"Q  And did you stay there until she died?

"A  Yes, sir."

The student nurse who was on duty on the first floor with Miss Green at the time she was attacked testified that about three o'clock A.M. on September 11, 1946, she was sitting at the desk where the two main halls converge when she and Miss Green heard a noise as though someone had knocked papers off a table, and they went to investigate. They inspected all the rooms on the first floor except the dining room where there were no patients. They found nothing wrong and resumed their duties. The witness then sat down at a desk to do some chart work and Miss Green went to get some medication for one of the patients who was in the hallway. When the deceased went into the treatment room to get the medication, the witness heard a loud thud and upon turning immediately to look saw Miss Green lying on the floor. She went over immediately to assist her, and as she did so was struck a blow from behind. When she attempted to get up she was struck again several times until she was knocked completely down, and while lying flat on her back on the floor she saw a man standing over her with a club raised ready to strike her in the face. She rolled over on her side, grabbed his foot and tripped him and was able to make her escape to the second floor.

This witness described the man as being a large burly-type man, with a large nose or prominent cheek bones, a little under six feet tall, with large bulging eyes and a white handkerchief stretched across his face.

This witness further testified in part:

"Q  When is the first time that you have seen this defendant since the night?

"A  When I was down at the Police Station about a year ago, I think.

"Q.  And then at a preliminary hearing?

"A  At a preliminary hearing, yes, sir.

"Q  So you have had a chance to observe him?

"A  Yes, sir.

"Q  As to whether or not the appearance of the defendant resembles the person that you saw with the club?

"A  I would say that he resembles him, yes, sir.

"Q  As to his eyes and forehead?

"A  Yes, sir.

"Q  As to cheek bones?

"A  Yes, sir.

.  .  .

"Q  And what was it that you saw about this man with a hat down over his head and his face covered up that wasn't clean-cut?

"A  It was an impression that I got of the man, sir.

"Q  Nothing you saw, is that it?

"A  Well, you can get an impression from seeing someone.

"Q  Yes, but what you saw was his eyes and a part of his forehead, right?

"A  That's right, sir.  His eyes were large and protruding and he had the appearance of being rough."

Upon the arrival of the police they found that a screen in one of the windows in the dining room

had been cut, raised, and a glass vent or ventilator had been removed from the window. Fingerprints were found on the glass ventilator, on the window ledge, and on the top of the metal radiator cover, which were later identified as being those of appellant.

On or about May 20, 1952, Lieutenant Spurgeon Davenport and Detective Sergeant James Rogers went to LaGrange, Kentucky, to interview appellant. They told him they were police detectives and wanted to talk to him about something which happened prior to his going to LaGrange, Kentucky, and that he was under no obligation to discuss the matter, but anything which he might say might later be used against him. They began their conversation by asking him his name, which he gave as Willie Breedlove. Among other things which they asked him was on what date he was discharged from service and he replied October 10, 1946. Later investigation with the Selective Service Division of the United States Army disclosed that appellant was actually discharged on August 10, 1946, and not on October 10. In this conversation appellant denied knowing anything about the location of the Indiana University Medical Center, or that he knew what it was, even though he had lived for some period of time on Michigan Street on which the Medical Center faces and by which he walked or drove each and every day as he went home during the time that he lived at 973 North Tremont Avenue in Indianapolis.

When confronted with the Selective Service Records showing his release from the service on August 10, 1946, appellant admitted that he might have been mistaken and that he was in Indianapolis on September 11, 1946, when the deceased was murdered. When Lieutenant Davenport told appellant at LaGrange, Kentucky, that they had been coming

there to talk to him because they had evidence that connected him with the murder of Alberta Green, "He shook his head and said, 'I didn't kill her and don't know anything about it.' At that time he complained of being warm, that it was hot in the room, and he took off his jacket, took out his handkerchief and wiped the perspiration that had begun to form on his face and forehead. Then I [Lieutenant Davenport] said, 'We're not just talking to you, Breedlove, about something we know nothing.' I said, 'Your prints were found on the inside of the dining room where the intruder entered who murdered the nurse, Alberta Green.' When I told him that he said, 'They can't be my prints, they just can't be my prints', and laid his head on his arm and started crying and uttered the words, 'God have mercy'. Then I told him, 'It would be better, Breedlove, if you would tell us about the circumstances surrounding the murder of Alberta Green rather than try to keep it. Your fingerprints put you there on the scene at the time of the murder and you are charged with it, you are charged with murder'. At that he stood up and started crying. He snatched his, didn't unbutton his collar, he snatched it and the button flew loose, and then he fainted. He was revived after about twenty or thirty seconds and started crying. Then I asked him again if he wanted to tell me about the murder of the nurse, Alberta Green. He shook his head and kept crying and walked away. That was the conversation the second time with Mr. Willie Breedlove at LaGrange, Kentucky."

On or about June 12, 1952, Lieutenant Davenport and Detective Sergeant Rogers returned to LaGrange, Kentucky, with a warrant for appellant's arrest. Appellant refused to return voluntarily to Indianapolis and, after court proceedings, he was delivered to the custody of the officers and

returned to Indianapolis on June 14, 1952. Lieutenant Davenport further testified that during a conversation had with appellant in the homicide office of the Indianapolis Police Department at which were present appellant's father, and an attorney representing appellant, appellant was again told that his prints were found on the inside of the dining room window of the Rotary Home where the murderer had entered, and that the fingerprints which were left there had been identified by Sergeant James Pearsey as appellant's prints. Upon the advice of appellant's attorney he requested to see the fingerprints which were exhibited to him, his father, and his attorney. On the advice of his attorney, appellant refused to answer any further questions.

On June 22, 1952, Lieutenant Davenport had another conversation with appellant in the presence of appellant's father and two other relatives. Appellant was again told that he was charged with the murder of Alberta Green and asked if he would cooperate with the police "to help establish his innocence, if he was innocent as he had claimed." Appellant was then asked if he would submit to a polygraph or lie detector test to help establish his innocence or guilt, and he answered, "No." He was then asked if he would take a truth serum test to establish his innocence or guilt, and he said "No." Appellant's father then asked him, "Why don't you take it, Willie? If you are innocent, why don't you take the test? If it is as good as they say it is, it will establish your innocence or help prove it." His brother also advised him to take the test but he refused. The Lieutenant then said to appellant, "You have nothing to lose. You are already charged with the murder and the most damaging thing against you now is that your prints were there

on the scene at the approximate time the murder was committed, which indicated that you were in the place at the time it happened." Appellant replied, "Well, I don't know enough about it. I'm not going to take it." This testimony was admitted without objection.

James Pearsey, a police officer of the City of Indianapolis assigned to the identification bureau, made comparative studies of fingerprints from 1949 to 1953, during which time he examined approximately 150,000 fingerprints trying to make a comparison between the latent fingerprints taken from the Rotary Convalescent Hospital on September 11, 1946, with the other prints which were already in the files of the police department, and with new prints as they were received. On April 23, 1952 he was able to make a comparison between the latent fingerprints taken from the hospital with those of the appellant herein and established that the fingerprints taken at the scene of the crime were those of the appellant. Other witnesses, including an FBI fingerprint expert identified the fingerprints found at the scene of the crime as being those of the appellant herein.

Near the body of the deceased there was found a chip which appeared to have been broken off of a stick of wood. On the following day (September 12, 1946) the police found a stick of wood or club approximately 350 feet due west of the south side of the building in which the deceased was murdered. The club was 34½ inches in length, 2½ to 2¾ inches in average diameter, and weighed two pounds and fourteen ounces, there was a brown hair net wrapped around and caught on the large end of the club. The laboratory tests showed that the club was stained with blood and there was a chipped place on it into which the piece found near

the body of the deceased fitted. The hair net was identified as belonging to the nurse who was struck by the assailant in her attempt to rescue the deceased.

On Sunday before the deceased was murdered a man and his wife on their way to the Rotary Convalescent Home to visit their daughter who was a patient there at the time, saw appellant on the east side of the hospital bending over with his hands resting on his knees looking into a basement window. The man walked over to appellant who was still looking into the basement window when the man asked if he could be of any assistance and if there was anyone in there he would like to see he would be glad to help him get a pass into the hospital. Appellant made no reply but merely turned and looked at him. After the return of appellant to Indianapolis in 1952, this man and his wife both identified appellant in a line-up in the Marion County jail as being the man whom they had seen looking into the hospital window on the Sunday afternoon before the deceased was murdered.

There were other circumstances related by state's witnesses which the jury might properly have considered in connection with the evidence above related in arriving at its verdict. However, we believe the evidence, as summarized above, when considered as a whole, is sufficient to sustain the verdict of the jury and it is not necessary to further burden this opinion with additional evidence favorable to the state.

We believe the evidence as above summarized and recited, when considered together with all the surrounding circumstances, was sufficient to sustain the verdict of the jury and it is not contrary to law.

While it was necessary for the state to prove every essential element of the crime with which appellant

was charged, beyond reasonable doubt, it is not necessary that all the incidental or subsidiary facts should be so proved.

" 'Evidence is not to be considered in fragmentary parts and as though each fact or circumstance stood apart from the others, but the entire evidence is to be considered and the weight of testimony to be determined from the whole body of the evidence. A circumstance considered apart from the other evidence may be weak, if not improbable, but when viewed in connection with surrounding facts and circumstances may be so well supported as to remove all doubts as to its existence as detailed by the witness. Acts considered apart from all other evidence may appear innocent, but when considered with other evidence may import guilt.' *Goodwin* v. *State* (1884), 96 Ind. 550, 571; *Hinshaw* v. *State* (1897), 147 Ind. 334, 379-381; *Wade* v. *State* (1880), 71 Ind. 535-539; Gillett, Crim. Law (2nd ed.) §911, p. 690." *Osburn* v. *State* (1905), 164 Ind. 262, 271, 73 N. E. 601.

There was sufficient evidence of circumstances from which the jury might reasonably have drawn an inference that appellant was guilty as charged. *Myers* v. *State, supra* (1954), 233 Ind. 66, 116 N. E. 2d 839, and cases there cited.

Other alleged errors discussed in appellant's brief are not contained in the motion for a new trial. Therefore, under the assignment of error no question is presented for our consideration.

Finding no reversible error in the record, the judgment of the trial court must, therefore, be affirmed.

Judgment affirmed.

Landis, Arterburn and Achor, JJ., concur.

Emmert, J., not participating.

NOTE.—Reported in 134 N. E. 2d 226.