WEDMORE *v.* STATE OF INDIANA.

[No. 29,377. Filed June 28, 1957. Rehearing denied September 18, 1957.]

George T. *Patton*, of South Bend, for appellant.

*Edwin K. Steers*, Attorney General, and *Owen S. Boling*, Deputy Attorney General, for appellee.

BOBBITT, J.—Appellant was charged by affidavit with having carnal knowledge of a female child under the age of sixteen years under Acts 1941, ch. 148, §3, p. 447, being §10-4201, Burns' 1956 Replacement, tried by jury, found guilty of assault and battery,[1] and sentenced to the county jail for 180 days and fined in the sum of $1,000.

Two errors are assigned as follows:

1. The court erred in overruling appellant's motion to discharge for lack of prosecution.

2. The court erred in overruling appellant's motion for a new trial.

---

1. Any touching of the person of a female child under the age of sixteen years with the intent to have sexual intercourse with her, is in legal contemplation without her consent. *Caudill* v. *State* (1946), 224 Ind. 531, 536, 69 N. E. 2d 549.

We shall consider the assigned errors in the order mentioned.

*First:* Appellant asserts that the trial court caused him to be held by recognizance bond beyond three terms of court in violation of Acts 1905, ch. 169, §220, p. 584, being §9-1403, Burns' 1956 Replacement, by "failing to appoint and qualify a special judge under Rule 1-12" of this court.

We deem it unnecessary to detail here the proceedings had in the St. Joseph Superior Court for the selection of a special judge. It is sufficient to note that appellant filed a motion for a change of venue from the judge in the term in which he was arrested and entered his plea. The ensuing delays resulted from such motion.

Appellant, by his request for a change of judge, set in motion the chain of events which caused the delay in his trial. This delay was caused by his acts, hence he is not entitled to a discharge under §9-1403, *supra*. *Sullivan* v. *State; Flick* v. *State* (1939), 215 Ind. 343, 345, 346, 19 N. E. 2d 739; *Colglazier* v. *State* (1953), 231 Ind. 571, 575, 110 N. E. 2d 2; *Shewmaker* v. *State* (1956), 236 Ind. 49, 138 N. E. 2d 290.

The trial court did not err in overruling appellant's motion for discharge.

*Second:* The sole question presented by the second assignment of error is the sufficiency of the evidence to support the verdict of the jury.

Considering the evidence most favorable to the appellee, the record discloses that Richard Wedmore and Jack Holderman picked up two girls, ages 14 and 15 years, respectively, under the false representation to the father of one of the girls that they were taking

them to baby sit for Wedmore's sister, telling the girls that they were going dancing and have a party. They proceeded to take the girls across the Michigan State line where they bought two cases of beer.

On their return they took one case of beer to the Wedmore apartment where they picked up appellant, Jack Wedmore, who at that time was separated from his wife. The three men and the two girls then went to pick up another girl for appellant. After picking up the third girl they all then went to the apartment of Jack Holderman where they drank beer and wine and danced. The prosecuting witness testified that about 5:30 p.m. appellant took her into the bedroom, which was off a hallway in the apartment, where he removed part of her clothing, and had sexual intercourse with her, the details of which, including the penetration, were fully related by the prosecuting witness.

This witness, in her statement to the South Bend police, made on March 31, 1953, which is in the evidence as State's Exhibit "C," related that she got to her brother's apartment about 8:30 p.m. on the day of the alleged act, and that she told her sister-in-law, Grace Reed, about what had happened, and that she also told the other two girls (Martha Richards and Caroline Bauer) who had been with her at the Holderman apartment.

Appellant asserts that there is not sufficient evidence of probative value to sustain the conviction herein because (1) the "case rests upon the testimony of a single witness who is so discredited on material matters by contradictory testimony as to render her testimony unworthy of belief."; and (2) because the State took no steps to require a psychiatric examination of the witness to determine her probable credibility.

We shall consider these reasons in the order named.

(1)  The record discloses that the prosecuting witness, on or about September 25, 1953, called appellant's sister by telephone to tell her that she "wanted to change my [her] story about Dick and Jack Wedmore."; and that on February 17, 1954, the prosecuting witness went to the office of appellant's attorney and signed a statement reciting that appellant did not have sexual relations with her on March 30, 1953, "or any other date."

There is also in the record statements by the prosecuting witness herein in which she said that she did not have sexual intercourse with *Dick Wedmore*, but on the occasion of each of these statements she stated, without equivocation, that there was nothing said at the time she made these statements relating to Dick Wedmore, about changing her story concerning Jack Wedmore, the appellant herein.

The prosecuting witness was 17 years of age at the time of the trial upon which this appeal is based. Whether or not she was telling the truth when she signed the statement in the office of appellant's attorney, or on the witness stand at the time of the trial, was a question for the jury. The credibility of the witnesses herein and the weight of their testimony are questions for the jury, and this rule applies in an action for rape. *Liechty* v. *State* (1930), 202 Ind. 66, 74, 169 N. E. 466; *Ritter* v. *State* (1946), 224 Ind. 426, 427, 67 N. E. 2d 530.

It is not within the power of this court to determine the credibility of a witness or to say when a witness is telling the truth. *Yessen* v. *State* (1955), 234 Ind. 311, 315, 126 N. E. 2d 760. It is apparent from the verdict that the jury believed the prosecuting witness' testimony given at the trial—this they

had a right to do, and, in so doing, they could take into consideration the fact that the statement reciting that she did not have sexual relations with the appellant was signed by her in the office of appellant's attorney at a time when only she and he were present, and also that such statement was witnessed by the attorney for appellant.

In determining her credibility as a witness for the State, and in support of her testimony, the jury also had the right to consider the fact that, at her first opportunity, the prosecuting witness told her sister-in-law and the other two girls who were at the Holderman apartment, about the incident which allegedly occurred in the bedroom. *People* v. *Davis* (1957), 10 Ill. 2d 430, 140 N. E. 2d 675, 680.

The jury is not required to consider the evidence in fragmentary parts, " 'but the entire evidence is to be considered, and the weight of testimony to be determined from the whole body of the evidence.' " *Breedlove* v. *State* (1956), 235 Ind. 429, 134 N. E. 2d 226, 232.

In our opinion there is sufficient evidence in the record before us to sustain the verdict of the jury.

(2) Appellant relies upon *Burton* v. *State* (1953), 232 Ind. 246, 111 N. E. 2d 892, to support his contention that the judgment of the trial court should be reversed because the State did not have the prosecuting witness examined by a physician before the trial.

As was true in the Burton Case, no question was raised in the trial court concerning the competency of the prosecuting witness herein to testify, nor was any request made by the appellant or his attorney that such witness be subjected to a psychiatric or any other medical examination.

There is no statutory or other law in Indiana which requires the State to assist a defendant in the defense of his case. If the defendant had any question ■ as to the competency of the State's witness, it was his duty to raise such question in the trial court at the earliest opportunity, and failing so to do any such question is waived. *Pooley* v. *State* (1945), 116 Ind. App. 199, 204, 62 N. E. 2d 484; *Bingham et al.* v. *Walk et al.* (1891), 128 Ind. 164, 173, 27 N. E. 483.

". . . the overwhelming weight of authority indicates that 'the question of the competency of a witness to testify, whether the objection is based on the ground of interest, relationship, infamy, or want of credit, incapacity to understand the nature of an oath, death of one of the parties to a contract, or other ground, comes too late when raised for the first time in the appellate court.' 3 C. J., Appeal and Error, §740, p. 828, [4 C. J. S., Appeal and Error, §294] and cases cited. Indiana seems to be in line with the majority rule." *Pooley* v. *State, supra* (1945), 116 Ind. App. 199, 204, 62 N. E. 2d 484.

We concur in the statement by Judge Draper in the dissenting opinion in *Burton* v. *State, supra,* at pages 260, 261, of 232 Ind., as follows:

"But no objection was made to the testimony of this child because she had not been cleared by a psychiatrist. None such could be made. Our ■ legislature has not seen fit to require such as a condition precedent to the right to testify in court, and I do not believe this court has any right to impose it.

"I do not hold lightly the language found in Wigmore's Treatise on Evidence (3rd Ed.), Vol. 3, §924a, which is referred to in the majority opinion. I think it merits the careful consideration of the General Assembly. But if the suggestions therein made are to become the law in Indiana, it should be made law by the legislature. Procedural methods and safeguards should be established and

clearly pointed out. To say that a woman may not testify against a man in a sex case unless she first submits to a psychiatric examination covering, perhaps, a period of many months, in the absence of legislation requiring it, seems to me to be an unwarranted arrogation of authority which this court does not have.

\* \* \* \* \*

"I do not know whether the state undertook to determine whether this little girl was a 'fantast.' If so, I doubt whether the state would have had the right to prove it. I do know that the appellant did not see fit to inquire into that possibility on cross-examination."[2]

What is said there by Judge Draper covers fully the situation in this case. It correctly states the prevailing rule on the subject and will be applied in the case at bar.

There is no statute in Indiana making provision for

2. It is of interest to note that this court has held that the competency of a six-year-old child could not be referred to someone other than the court itself to determine. *Simpson* v. *The State* (1869), 31 Ind. 90.

The Georgia Supreme Court held in *Jeffers* v. *State* (1916), 145 Ga. 74(5), 88 S. E. 571, that a medical expert, after examination of the prosecuting witness on a charge of rape, was properly permitted to state his opinion as to her mental development, and to testify that it was considerably below the average, and that he regarded her as a child. However, the record does not show at whose request the examination was made.

It has also been held that the court has no power to compel a witness in a criminal case to submit to a medical examination to determine whether or not she was afflicted with hysteria, on the ground that to do so would be an unwarranted invasion of her right of personal liberty. *Goodwin* v. *State* (1902), 114 Wis. 318, 90 N. W. 170.

In a case where there was no evidence tending to show that the prosecuting witness on a charge of incest, who was under the age of consent, was physically or mentally diseased, or that her memory had been affected by her early development, it was held that testimony of a medical expert, offered to impeach the witness, as to the effect of premature sexual development on the mental development of a child, was properly excluded. *State* v. *Pelser* (1917), 182 Iowa 1, 163 N. W. 600.

a psychiatric examination of a prosecuting witness in any case. Cf.: *Chesterfield* v. *State* (1924), ■ 194 Ind. 282, 294, 141 N. E. 632; *Cosilito* v. *State* (1926), 197 Ind. 419, 424, 151 N. E. 129.

The question of stability and mental condition of the prosecuting witness herein concerned her competency and was a matter for the court to ■ determine. *Simpson* v. *The State* (1869), 31 Ind. 90; *The City of Fort Wayne* v. *Coombs et al.* (1886), 107 Ind. 75, 7 N. E. 743, 57 Am. Rep. 82; *Dickson et al.* v. *Waldron* (1893), 135 Ind. 507, 524, 35 N. E. 1, 24 L. R. A. 483, 41 Am. St. Rep. 440; *Myers* v. *State* (1922), 192 Ind. 592, 601, 137 N. E. 547, 24 A. L. R. 1196; *Butler* v. *State* (1951), 229 Ind. 241, 245, 97 N. E. 2d 492.

The prosecuting witness was 17 years of age at the time of the trial and it is readily apparent that she was a competent witness under the statute,[3] and ■ her credibility was a question for the jury. *Holmes* v. *The State* (1882), 88 Ind. 145, 147; *Tyrrel* v. *State* (1912), 177 Ind. 14, 97 N. E. 14; *Jacoby* v. *State* (1936), 210 Ind. 49, 199 N. E. 563; *Thompson* v. *State* (1946), 224 Ind. 290, 66 N. E. 2d 597.

Prior to *Burton* v. *State, supra* (1953), 232 Ind. 246, 111 N. E. 2d 892, the rule was well settled in Indiana that a conviction for rape may be sustained upon ■ the uncorroborated testimony of a prosecuting witness, if such was sufficient to convince the

---

3. Acts 1905, ch. 169, §235, p. 584, being §9-1603, Burns' 1956 Replacement; Acts 1881 (Spec. Sess.), ch. 38, §274, p. 240, being §2-1713, Burns' 1946 Replacement; Acts 1881 (Spec. Sess.), ch. 38, §275, p. 240, being §2-1714, Burns' 1946 Replacement; *Jordan* v. *The State* (1895), 142 Ind. 422, 41 N. E. 817.

trier of the facts beyond a reasonable doubt of the defendant's guilt. *Chesterfield* v. *State, supra* (1924), 194 Ind. 282, 294, 141 N. E. 632; *Cosilito* v. *State, supra* (1926), 197 Ind. 419, 425, 151 N. E. 129; *Abshire* v. *State* (1927), 199 Ind. 474, 477, 158 N. E. 227; *Thomas* v. *State* (1949), 227 Ind. 42, 45, 83 N. E. 2d 788; *Bramlett* v. *State* (1949), 227 Ind. 662, 663, 664, 87 N. E. 2d 880.

We do not believe this court has the power or authority to require the State to support the testimony of a prosecuting witness in a sex case by requiring her to submit to a psychiatric examination, the report of which is to be presented in evidence, in order to sustain a conviction.

For the reason above stated, insofar as *Burton* v. *State, supra* (1953), 232 Ind. 246, 111 N. E. 2d 892, purports to require that in any sex case the complaining witness be required to be examined, before testifying, by a psychiatrist for the purpose of examining her social history and ascertaining her probable credibility, the report of such examination to be presented in evidence, it is disapproved and overruled.

This is consistent with the rule that the credibility of a witness is a question for the trier of the facts.

In this case if timely objection to the competency of the prosecuting witness had been made, it would have been the duty of the court to make such an examination as would satisfy it as to her competency or incompetency. 58 Am. Jur., Witnesses, §134, p. 101; and §211, p. 144.

The prosecuting witness in this case, being 17 years of age, took the witness stand clothed with the presump-

tion of competency, and the burden of establishing the contrary was upon the defendant-appellant. 58 Am. Jur., Witnesses, §210, p. 144.

We recognize the problem discussed by Professor Wigmore in Vol. III, §934a, p. 485, of his Treatise on Evidence, however, we have been unable to find, even in the cases cited under §934a, *supra,* where the State was either required or permitted to introduce evidence as to the mental capacity or competency of the prosecuting witness in a criminal case involving a sex crime. Cf.: *State* v. *Teager* (1936), 222 Iowa 391, 269 N. W. 348; *State* v. *Pelser* (1917), 182 Iowa 1, 163 N. W. 600; *Miller* v. *State* (1930), 49 Okla. Cr. 133, 295 Pac. 403; *State* v. *Driver* (1921), 88 W. Va. 479, 107 S. E. 189, 15 A. L. R. 917; *Goodwin* v. *State* (1902), 114 Wis. 318, 90 N. W. 170; *Strand* v. *State* (1927), 36 Wyo. 78, 252 Pac. 1030.

In our opinion the court has no power on request of the State, to compel a prosecuting witness in a criminal case to submit to a medical examination and, on its behalf, present the findings of such an examination to the jury *via* the testimony of the examining physician, for the purpose of impeaching or supporting the testimony of such witness.

If the court, within its sound discretion, on request of the defendant-appellant herein, had ordered such an examination appellant would thereby have waived the right to object to the report of the examining physician if it was adverse to him, and at the same time he would have been given all the protection against fantasy and fabrication on the part of the prosecuting witness as proposed by Professor Wigmore. *People* v. *Cowles* (1929), 246 Mich. 429, 224 N. W. 387. Also, as a result of this procedure, there could be no complaint that either the State or the court had dictated

the course of the accused's defense or had been a party to the admission of objectionable evidence which might materially influence the jury adversely to the defendant.

Finally, Professor Wigmore, himself, recognizes that his proposal for psychiatric examination in sex crimes is a matter for the Legislature and not one within the power of the courts when he sets out in full in Wigmore on Evidence, Vol. III, §924b, p. 467, a proposed statute for the protection of the injustices which he so vigorously proclaims.

*Third:* We are asked to consider evidence in the record in the first trial, *Wedmore* v. *State* (1954), 233 Ind. 545, 122 N. E. 2d 1, but which is not in the record in the case at bar. It is also proposed that we now weigh the evidence as it appeared in the record in the first trial, to determine the credibility of the prosecuting witness in the case now at bar.

It is asserted that *"Both* records show numerous statements by her under oath that she did not have sexual intercourse with the appellant or his brother."; and, further, "The first day the prosecutrix testified during the *first* trial, seven times she denied having had sexual relations with the appellant. The next day she took the witness stand and said she did have intercourse with the appellant at the home of Jack Holderman. Before she took the stand she was outside the court room crying." (Our italics.)

The record in this case, and upon which our decision here must rest, shows one, and only one, statement by the prosecuting witness that she never had sexual relations with the appellant. The testimony in the first trial is not a part of the record in the second trial or in the appeal now before us.

It is further suggested that we examine the record of the first appeal and take judicial notice of what is

therein contained. The cases relied upon by the proponent of this unusual procedure, to sustain a search outside the record for something on which to reverse the judgment of the trial court, are not authority for considering evidence which was before us in the first appeal but *does not appear* in the record in the case at bar.

It is true that we take notice of a former appeal and the judgment rendered therein, but we do not judicially note the evidence in one action when we are considering another. Cf.: *Yessen* v. *State, supra* (1955), 234 Ind. 311, 126 N. E. 2d 760. The case at bar—even though it is a second appeal involving the same people and offense—comes to us as an entirely new case; and we cannot use facts which may be in the record in the first trial, upon which to predicate error in the second trial, unless such evidence has, by proper procedure, been made a part of the record in the second trial, and is included in the Bill of Exceptions in the second appeal. That is not the case here. None of the evidence referred to above is to be found in the record in the case now before us, and even if it were we could not weigh it to determine when a witness is telling the truth. In this case that was a matter for the jury.

Numerous decisions of this court, without exception, since its creation, have held that we will not search the record to reverse. We have no right or authority to go *de hors* the record in search of a reason to reverse this case.

In a further effort to find some error upon which the judgment herein might be reversed, it is asserted that, "The State failed to produce any evidence whatever that in any way corroborated her statement as to

intercourse with either Wedmore. She made no outcry, she made no complaint."

If corroborating evidence is necessary, it is to be found from a consideration of all the evidence together with proper inferences which may be drawn therefrom. As to the prosecuting witness making no outcry or complaint, the evidence is such that the jury might even have inferred that she was a willing participant. However, these matters form no element of the crime when the charge is statutory rape. *Caudill* v. *State* (1946), 224 Ind. 531, 536, 69 N. E. 2d 549.

For the reasons above stated the judgment of the trial court will be affirmed.

Judgment affirmed.

Arterburn, C. J., Landis and Achor, JJ., concur.

Emmert, J., dissents with opinion.

### DISSENTING OPINION

EMMERT, J.—From the time of Blackstone, the dangers of a female's false accusations of rape causing an innocent victim to lose his life or liberty have been clearly recognized by all well considered authorities. When this court now overrules *Burton* v. *State* (1953), 232 Ind. 246, 111 N. E. 2d 892, it does not do so on the basis that the reason for the rule has ceased, and therefore the rule should cease. When a reason ceases, it is generally adequate cause for overruling prior precedents. Nor it it a case where there never was any reason for the rule in the first place. It overrules the Burton case by returning to the now thoroughly discredited *Yessen* v. *State* (1950), 228 Ind. 316, 92 N. E. 2d 621, where a three to two majority of this court affirmed a conviction on the perjured testimony of a juvenile

delinquent, given in support of an affidavit, in the execution of which the agents for the State committed a felony and a fraud on the trial court, as disclosed by the uncontradicted sworn testimony before the United States District Court for the Northern District of Indiana. See dissenting opinion *Yessen* v. *State* (1955), 234 Ind. 311, 319, 323, 126 N. E. 2d 760. There, not only did the prosecutrix say she lied under oath, but the affidavit itself, being executed by the commission of a felony, was void *ab initio*. It logically follows all subsequent proceedings, including the judgment, were void.

At least since 1769 it has been the enlightened policy of the criminal law to give primary consideration to the protection of the innocent, "for the law holds it better that ten guilty persons escape, than that one innocent party suffer." Blackstone, Commentaries on the Law (Gavit's Ed.), Ch. 27, p. 909. Unless this court is going to repudiate this philosophy in the administration of criminal justice, it should heed the unanimous opinion of the internationally noted authorities on psychiatry, such as Dr. Karl A. Menninger and the others cited by Dean Wigmore, and hereinafter quoted.

If ever there was a conviction based upon the uncorroborated testimony of a prosecutrix who was an admitted perjurer many times, this appeal is it.

This is the second time the facts embraced in the charge come before this court. In the first appeal, cause No. 29,195, we reversed the judgment of the St. Joseph Probate Court for want of jurisdiction of the subject matter by that court. *Wedmore* v. *State* (1954), 233 Ind. 545, 122 N. E. 2d 1. We have examined the record of the first appeal and properly take judicial notice of what is therein contained. *Denny, Clerk* v. *State* (1896), 144 Ind. 503, 42 N. E. 929; *Rooker* v. *Fidelity*

*Trust Co.* (1931), 202 Ind. 641, 651, 652, 177 N. E. 454; *In re Harrison* (1953), 231 Ind. 665, 109 N. E. 2d 722.

Appellant's motion for a new trial challenges the sufficiency of the evidence to sustain the verdict. Upon the second trial Nancy Marie Reed, hereinafter referred to as the prosecutrix, testified in substance that she was born September 12, 1937; that in the afternoon of Sunday, March 29, 1953, she, and Martha Richards, Caroline Bauer, Richard (Dick) Wedmore, Jack Wedmore and Jack Holderman were at Holderman's house; that she and the other two girls had been drinking wine and beer and some of the young men had been drinking beer; that they had music and were dancing; that about 5:30 P.M. appellant took her to a bedroom where he had intercourse with her. In about one-half hour all of them left and went to the Wedmore apartment. While at the Wedmore apartment Joyce Wedmore, the estranged wife of Jack Wedmore, and her sister Carol Murphy made a visit.

Two days later the prosecutrix and Martha Richards were taken to police headquarters where Officer Soko and Policewoman Hartman threatened the prosecutrix "with Reform School," and then took her written statement in which she charged appellant had sexual relations with her at the Holderman home, and Richard Wedmore also had intercourse with her later at the Wedmore home. The State never attempted to deny the clear evidence the proscutrix was threatened with commitment to the Indiana Girls' School.

The State failed to produce any evidence whatever that in any way corroborated her statement as to intercourse with either Wedmore. She made no outcry, she made no complaint. Her *ex parte* coerced statement to the police about telling Grace Reed, Martha Bauer and Caroline Bauer did not amount to any complaint, nor

did the State have any of these people testify as to the incident. There was no medical examination had, nor was there any psychiatric examination, or examination by any physician qualified to give an opinion as to her mental condition. Both records show numerous statements by her under oath that she did not have sexual intercourse with the appellant or his brother. At the second trial she was confused, and when confronted with her contradictory testimony she became hysterical.

The first day the prosecutrix testified during the first trial, *seven times she denied having had sexual relations with the appellant.* The next day she took the witness stand and said she did have intercourse with the appellant at the home of Jack Holderman. Before she took the stand she was outside the court room crying. We could hardly presume the appellant induced her to change her testimony. As to the State's activities, "there comes a point where this Court should not be ignorant as judges of what we know as men." *Watts* v. *Indiana* (1949), 338 U. S. 49, 52, 69 S. Ct. 1347, 93 L. Ed. 1801, 1805. On January 20, 1954, she voluntarily went to the office of appellant's counsel and executed an affidavit that Richard Wedmore never did have sexual relations with her at any time at any place. Before that, on the 17th day of November, 1953, *before a Deputy Prosecuting Attorney she executed an affidavit that she had given perjured testimony in St. Joseph Probate Court that Richard Wedmore had had sexual intercourse with her and that in fact he had never at any time done so.*

On February 17, 1954, she again went to the office of appellant's counsel and executed an affidavit that appellant *"Jack Wedmore did not have sexual relations with me on that date or any other date; and that he in no way molested me in any way, sexually or otherwise."*

(Italics supplied.) Neither visit to Mr. Patton's office was solicited by him. Thus, by the prosecutrix' own words her testimony stands impeached, contradicted and perjured, not only as to this appellant but also as to his brother.

The grave danger to the innocent in permitting a sex conviction to stand on the uncorroborated testimony of a prosecutrix is conceded by all the experienced medical authorities in the field:

> "Psuedologia phantasticia is a mixture of lies with imagination. Not infrequently, this is the basis of alleged sexual assault. Girls assert they have been raped, sometimes recounting as true a story they have heard, falsely naming individuals or describing them." 1 Gray's Attorneys' Textbook of Medicine (3rd Ed.), §96.16, p. 940.

Dean Wigmore, in his Treatise on Evidence, Vol. 3, §924a (3rd Ed.), quotes the following recognized international medical authorities on the problem:

> " 'The most dangerous witnesses in prosecutions for morality offences are the youthful ones (often mere children) in whom the sex-instinct holds the foremost place in their thoughts and feelings. This intensely erotic propensity often can be detected in the wanton facial expression, the sensuous motions, and the manner of speech. But on the other hand one must not be deceived by a madonna-like countenance that such a girl can readily assume; nor by the convincing upturn of the eyes, with which she seeks to strengthen her credibility. To be sure, the course sensuousness of her demeanor, coupled with a pert and forward manner, usually leaves no doubt about her type of thought. Even in her early years can be seen in countenance and demeanor the symptoms of the hussy-type, which in later years enable one at first glance to recognize the hardened prostitute. With profuse falsities they shamelessly speak of the coarsest sex-matters. Having come early into bad practices, they can weave these into their testimony and decorate their narratives with

the most plausible details. . . . It is just such witnesses that often bring into their picture individuals who have never even been near them and that throw suspicion recklessly on the most worthy persons'." Dr. Otto Monkemoller, "Psychology and Psychopathology of Testimony," (Vol. IV of Bibliothek der Kriminalistik, ed. Aschaffenburg and Kriegsmann), Part 2, Chap. B, §a6, p. 333.

" 'Every girl who enters a plausible but unproved story of rape should be required to have a psychiatric examination. As you know, I have elsewhere expressed myself publicly as favoring the psychiatric examination of criminals and those charged with crime, and I agree with you that this should be extended to include some of the individuals who make criminal charges, not only of rape but also of malpractice and other personal attacks. The reason I think that rape in particular belongs in this category is one well known to psychologists, namely, that fantasies of being raped are exceedingly common in women, indeed one may almost say that they are probably universal. By this I mean that most women, if we may judge from our clinical experience, entertain more or less consciously at one time or another fleeting fantasies or fears that they are being or will be attacked by a man. Of course, the normal woman who has such a fantasy does not confuse it with reality, but it is so easy for some neurotic individuals to translate their fantasies into actual beliefs and memory falsifications that I think a safeguard should certainly be placed upon this type of criminal charge.

" '. . .' " Dr. Karl A. Menninger (Menninger Clinic of Psychiatry and Neurology, Topeka, Kan.) ; MS letter Sept. 5, 1933.

" 'Accusations of rape, unless there is perfectly clear evidence of an assault, are open to suspicion. Necessarily they must always be treated as open to suspicion if the accusation is a purely verbal one unsupported by corroborative evidence. Such accusations are doubly difficult to deal with when it is remembered that the medical evidence sustaining or otherwise such accusations is proverbially not dependable and inadequate. . . .' " Dr. William A. White (U. S. Department of the Interior, Supt. St.

Elizabeth's Hospital, Washington, D. C.) ; MS. letter Sept. 7, 1933.

" 'We, who have had extensive criminal experience among the mentally ill, know how frequently sexual assault is charged or claimed with nothing more substantial supporting this belief than an unrealized wish or unconscious, deeply suppressed sex-longing or thwarting. A person need not be insane to have a craving that is intolerable or in conflict with reality, and a person need not be seriously disturbed mentally to find some satisfying substitute for a suppressed and self-denied wish, nor to have such appear as a reality in spite of oneself. This is a well accepted mental mechanism. I, therefore, believe that while psychiatric examination is desirable in all criminal cases, it is imperative in every case where sexual assault is charged.' " Dr. W. F. Lorenz (Director of the Psychiatric Institute, University of Wisconsin) ; MS. letter of Sept. 19, 1933.

The specific instances related by Dr. Wm. Healy and Mary Teeney Healy in the same section of Wigmore are too detailed to cite here without unduly extending this opinion.

Dr. Alfred W. Herzog in his treatise on Medical Jurisprudence (1931), also takes notice of the dangerous propensity to falsely accuse an innocent man in some sex offenses:

"Charges of rape are in many cases false and the testimony of the alleged victim should be scrutinized very carefully. Not only are false charges often made against a man to whom the complaining witness submitted willingly, but very frequently against an entirely innocent party, for the purpose of shielding the one who may have had sexual intercourse with the female and caused her to become pregnant. . . . [Page 827.]

". . . Likewise, in some cases injuries to the genital organs of a child are made purposely so as to fasten the crime of rape on some innocent person. . . . [Page 831.]

"Accusations of rape being a favorite method of either covering one's own sexual misconduct or for blackmail, it has frequently occurred that small children were purposely injured by their mother for the purpose of simulating effects of rape, by bruising the parts, destroying the hymen, dilating the vagina and even infecting them with gonorrhoea. There are cases in which a mother discovers that her little girl either has a vaginal discharge or bleeds from the vagina at an age when the first menstruation is not yet expected. She may suspect a sexual assault on her child and interrogate the little girl and by either frightening her or by awakening the child's pseudologia phantastica, start the child to romancing and confessing a sexual attack on her, which story is without foundation. Thus an innocent person may be accused of having committed rape. Little girls when they once have told such story will generally stick to it and only careful questioning will sometimes succeed in baring the deceit by the impossible details of the crime related by the child. [Page 845.]

"Many accusations of rape have been made against physicians and dentists. Most of these are deliberate false charges for the purpose of blackmail or collecting money by suit or by settlement, while other charges of rape are made by individuals who, while coming out of narcosis, have voluptuous dreams and honestly believe that they have been raped. Such may also happen in hysterical cases. . . ." [Pages 845-846.]

Even in the 1700's when the recognized treatment for the mentally ill was placing them in jail or a "madhouse," experienced judges and lawyers had observed the grave dangers to the innocent when charged with a sex offense.

". . . Where the evidence of children is admitted, it is much to be wished, that there should be some concurrent testimony of time, place and circumstances, in order to make out the fact; and that the conviction should not be grounded solely on the unsupported accusation of an infant, under years

of discretion. The charge of rape, said Hale, is an accusation easy to make, hard to be proved, but harder to be defended by the party, accused, though innocent." Blackstone, Commentaries on the Law (Gavit's Edition), p. 840.

The American Bar Association by its Committee on the Improvement of the Law of Evidence (1937-38) took note of the experience of courts and psychiatrists, and reported as follows:

" 'Psychiatric Examination of Witnesses in Sex Cases. The penalties for sex-crimes are very severe, —justly so, in most cases. But the very severity of the penalty calls for special procedural precautions to protect an innocent accused from condemnation by unreliable testimony.

" 'Modern psychiatry has already made its bow and been introduced properly to the criminal courts, by way of examining the mental condition of the accused. But there is also a necessity for invoking its aid for a certain type of witness in a certain class of criminal charges.

" 'Today it is *unanimously* held, (and we say "unanimously" advisedly) by experienced psychiatrists that the complainant woman in a sex offense should *always* be examined by competent experts to ascertain whether she suffers from some mental or moral delusion or tendency, frequently found especially in young girls, causing distortion of the imagination in sex cases.

" 'The imperative nature of this measure is further emphasized by the legal fact that the penalty for intercourse with a girl under sixteen years (so-called "statutory rape") is extremely heavy—sometimes twenty years; in one State, life imprisonment! Thus the erotic imagination of an abnormal child of attractive appearance may send an innocent man to the penitentiary for life. The warnings of the psychiatric profession, supported as they are by thousands of observed cases, should be heeded by our profession.

" 'We recommend that in all charges of sex offenses, the complaining witness be required to be

examined before trial by competent psychiatrists for the purpose of ascertaining her probable credibility, the report to be presented in evidence.' " 3 Wigmore, Evidence (3rd Ed.), §924a.

Dean Wigmore's advice, which this court now holds of no value, is as follows:

"There is, however, at least one situation in which chastity may have a direct connection with veracity, viz. when *a woman or young girl testifies* as complainant against a man charged with a sexual crime,—*rape, rape under age, seduction, assault.* Modern psychiatrists have amply studied the behavior of errant young girls and women coming before the courts in all sorts of cases. Their psychic complexes are multifarious, distorted partly by inherent defects, partly by diseased derangements or abnormal instincts, partly by bad social environment, partly by temporary physiological or emotional conditions. One form taken by these complexes is that of contriving false charges of sexual offenses by men. The unchaste (let us call it) mentality finds incidental but direct expression in the narration of imaginary sex-incidents of which the narrator is the heroine or the victim. On the surface the narration is straightforward and convincing. The real victim, however, too often in such cases is the innocent men; for the respect and sympathy naturally felt by any tribunal for a wronged female helps to give easy credit to such a plausible tale.

"No doubt any judge of a criminal Court and any prosecuting attorney can corroborate this with instances from his own observation. But the lamentable thing is that the orthodox rules of Evidence in most instances prevent adequate probing of the testimonial mentality of a woman-witness, so as to reveal the possible falsity of such charges. Judging merely from the reports of cases in the appellate courts, one must infer that many innocent men have gone to prison because of tales whose falsity could not be exposed. And the situation of injustice has become the more extreme, because in some States the so-called age of consent has been raised to 16 or 18 years (thus making consent immaterial below

that age) and in a few States even life imprisonment may be imposed; so that a plausible tale by an attractive, innocent-looking girl may lead to a life-sentence for the accused, because the rules of Evidence (and the judge's unacquaintance with modern psychiatry) permit no adequate probing of the witness' veracity.

"The modern realist movement having insisted on removing the veil of romance which enveloped all womanhood since the days of chivalry, it is now allowable for judges to look at the facts. The facts are that there exist occasionally female types of excessive or perverted sexuality, just as there are such male types; and that these are often accompanied by a testimonial plausibility which should not be taken at its face value. Only an inquiry into the social and mental history will reveal the degree of credibility. This inquiry the law of Evidence ought to permit to the fullest extent, rejecting the hindrance of rules that were framed without an understanding of these facts.

"*No judge should ever let a sex-offence charge go to the jury unless the female complainant's social history and mental makeup have been examined and testified to by a qualified physician.*

"It is time that the Courts awakened to the sinister possibilities of injustice that lurk in believing such a witness without careful psychiatric scrutiny. . . . " 3 Wigmore, Evidence (3rd Ed.), §924a.[1]

In the Burton case, *supra*, 232 Ind. 246, 255, 111 N. E. 2d 892, we did "not hold that in every case where

1. False accusations due to sex fantasies have a relevant parallel in the Salem Witchcraft trials where 20 innocent victims were executed on fantasy testimony. See Marion L. Starkey, The Devil in Massachusetts (1949), p. 2. Of these young women, "A few, notably Mary Walcott and Elizabeth Booth, presently settled down and got married. Some of the others, still manless, and apparently at a loss how to put in their time in these duller, flatter days, turned, it was rumored, to coarser pleasures; certain of them, never explicitly named in history, went unmistakably bad."

"In Salem Village where this development could be watched at close range, there was said to be a general revulsion against them. It was not good to watch a wench at her harlotries and remember that on that harlot's word the good and chaste had been hanged." *Ibid* pp. 240, 241.

a sexual offense is charged there should be a psychiatric examination of the prosecutrix. There are many cases where the facts and circumstances leave no doubt of the guilt of the accused, . . ." This places no undue burden upon the State, and does not require a psychiatric examination of the prosecutrix when her testimony is corroborated by other facts and circumstances in the record so that the conviction would not be had upon her story alone, which the experience of the ages has demonstrated is too often the means of taking the life or liberty of an innocent accused.

The Burton case, *supra*, 232 Ind. 246, 111 N. E. 2d 892, did not hold a prosecutrix was incompetent to testify. "An incompetent witness is one who does not answer the requirements of the law; not legally able or qualified to give testimony. The objection does not go to the evidence itself, but to the person." *Gilbert* v. *Estate of Swain* (1894), 9 Ind. App. 88, 90, 36 N. E. 374. What the Burton case held was the uncorrobrated testimony of a prosecutrix who had not had a psychiatric examination to test her credibility, was not substantial evidence of probative value upon which a conviction in a sex offense could rest. This can properly be raised by a motion for new trial on the ground the verdict or finding was not sustained by sufficient evidence. From the discussion I have had with the members of the bench and bar over the State I believe the legal profession supports the rule of the Burton case. The matter of sending innocent accused persons to the penitentiary is not one which should await a legislative remedy. The record in this case is about as strong as could be had for reaffirming the rule of the Burton case. Here the conviction must stand upon the sole testimony of a prosecutrix who by the records here was proved to be a pathological liar and perjurer.

The most shocking aspect of the proceedings had to obtain the judgment now under attack in this appeal lies in the fact that the State, through its representatives, knew it had to rely upon the uncorroborated testimony of a prosecutrix who had committed perjury with reckless abandon against both appellant and his brother. Such a judgment is so tainted it ought not be permitted to stand. The State must be presumed to have known that *Burton* v. *State* (May 5, 1953), 232 Ind. 246, 111 N. E. 2d 892, *supra,* had been the law of this jurisdiction for more than two years before the second trial, yet it made no effort, as far as this record goes, to have a psychiatric examination of the prosecutrix to determine whether it was about to attempt to send a man to prison on perjured testimony. If it did have such a psychiatric examination, we must assume that it showed the prosecutrix to be a psychopathic liar. The State may have assumed that the end justified the means as far as the appellant was concerned, but we cannot condone such a rule for administering justice. *Sylvester* v. *State* (1933), 205 Ind. 628, 187 N. E. 669. When the State insisted on carrying the prosecution through to its tainted conclusion after the perjuries had been discovered, its conduct appears no more than a face-saving procedure. The State's duty to be fair does not end with its preliminary investigation before the filing of a charge. It continues as long as the conviction stands. The only way for this court to do right and justice would be to reverse the judgment and order a new trial so that some competent psychiatrist can determine wherein lies the truth in the conflicting stories told under oath by the prosecutrix.

The judgment should be reversed.

NOTE.—Reported in 143 N. E. 2d 649.